UNITED STATES of America, Appellee,

v.

**Richard F. NUTILE, Appellant.**

UNITED STATES of America, Appellee,

v.

**Joseph INDELICATO, Appellant.**

**Nos. 76–1192 and 76–1193.**

United States Court of Appeals,
First Circuit.

Argued Oct. 5, 1976.

Decided March 11, 1977.

702

Barry M. Haight, Milton, Mass., with whom Buckley, Haight & Muldoon, Milton, Mass., was on brief, for appellants.

Jeremiah T. O'Sullivan, Sp. Atty., Dept. of Justice, Boston, Mass., with whom James N. Gabriel, U. S. Atty., Boston, Mass., was on brief for appellee.

Before COFFIN, Chief Judge, ALDRICH and McENTEE, Circuit Judges.

McENTEE, Circuit Judge.

Appellants were convicted after a jury trial of selling and transferring counterfeit Federal Reserve Notes in violation of 18 U.S.C. §§ 473 and 2.[1] This appeal raises several arguments.

## I. THE INFORMANT.

During the trial appellants moved to dismiss the indictment on grounds that the government had failed to use due diligence in identifying or locating an informer whose testimony would allegedly be of great importance to defendants' case. *See Roviaro v. United States*, 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957); *United States v. Davila Williams*, 496 F.2d 378 (1st Cir. 1974). The informant, referred to interchangeably as "John the Gypsy" and "John Tenney Bimbo" first contacted the United States Secret Service in Cambridge in September, 1974. He offered to put the

---

1. The defendants were also found guilty by the jury on a count alleging conspiracy to distribute the counterfeited notes. After return of the jury's verdict, the trial judge entered a judgment of acquittal on this count. In addition, prior to the close of the trial, the judge entered a judgment of acquittal as to defendant Nutile on a third count alleging illegal possession of other counterfeit notes.

Secret Service in touch with purveyors of counterfeit notes and on November 12, 1974, introduced an agent to the defendant Indelicato. The evidence shows that the agent negotiated directly with Indelicato for the purchase of $100,000 in counterfeit bills. The next day Indelicato negotiated further with the agent and directed him and Bimbo to proceed to the vicinity of a store where the defendant Nutile was employed. Indelicato explained that "My man will meet you there." An hour and a half later, Indelicato arrived at the designated location and informed the agent that "My man will be here in a few minutes." Nutile next arrived and informed Bimbo, out of the agent's hearing, that "the price has gone up, he wants $3,500 for $25,000 instead of $2,500."[2] Bimbo relayed the information to the agent, who refused to pay a higher price. Finally, the counterfeit funds were sold to the agent and the arrests of Indelicato and Nutile followed. Bimbo was paid $1,000 by the Secret Service for his assistance.

During his time of assistance to the Secret Service in 1974, Bimbo identified himself orally to agents as "the Gypsy" and "John Tenney Bimbo." He also produced a driver's license which contained what was subsequently discovered to be a false address.[3] Bimbo gave an agent a telephone number at which he could be reached. However, when the agent telephoned this number during the fall of 1974, an otherwise uncommunicative female voice told him to stop attempting to reach Bimbo at that number. The government also checked under the name "John Tenney Bimbo" for an arrest record but did not fingerprint him.

In response to a pre-trial motion for identification of the informant, the government provided appellants with the name "John Tini Bimbo" (*sic*) and the telephone number at which the agent had been unable to reach Bimbo.

In May, 1975, the government arrested Bimbo on a material witness warrant. He was released by a magistrate on bail. Several weeks later, at a hearing on defendants' motions to suppress evidence, the government announced that it had just learned that Bimbo had been committed to a mental hospital. Subsequent investigation revealed that Bimbo had left the hospital and that the address he listed on hospital records was false. The government obtained a new arrest warrant and placed his alleged address under surveillance. An agent testified that he searched for Bimbo on twenty occasions. Bimbo was never found.

In *United States v. Davila Williams, supra,* we set out the standard of reasonableness controlling the government's efforts to identify and produce informants:

> "[T]he government's duty under *Roviaro* to produce names and addresses requires it to produce correct information or at least to have exercised diligence reasonable under the circumstances to locate the informer. It would be serious misconduct for the government intentionally to withhold or to falsify the *Roviaro* information. How far it must go to keep track of, or search for, an informer is less easily stated; that depends on many factors including the extent of the government's control over the witness, the importance of the witness' testimony, the difficulty in finding him, and similar matters . . . [S]hould an informer disappear or become unavailable to the defense, we would compel the government, upon timely demand either to locate him or make an affirmative showing satisfactory to the court why it could not reasonably be expected to do so and of its diligence gener-

---

2. The Secret Service agent testified that Bimbo reported this conversation to him. Although of dubious admissibility, this testimony was not objected to below and its admission is not challenged on appeal.

3. The government at trial attempted to pursue a line of questioning exploring Bimbo's provision of a false address to the Secret Service. Counsel for defendant Nutile objected to admission of hearsay statements of Bimbo on this subject. The objection was sustained, and the government dropped this line of questioning.

ally as regards the disappearance." 496 F.2d at 382.

■ We think that the government partially fulfilled its *Roviaro* duty to identify the informant. The informer consistently gave his name as "John Tenney (or Tini) Bimbo" and we have no basis for doubting that this is his name. Appellants' assertions to the contrary are wholly speculative. And the provision of the only telephone number at which Bimbo could be reached went part of the way toward fulfilling the government's duty to inform appellants of his address.

Nevertheless, the government was unable accurately to identify the whereabouts of its informer and we therefore inquire in light of *United States v. Davila Williams, supra,* as to the adequacy of its efforts to locate Bimbo. We acknowledge that the informer's testimony was likely to be of critical importance to the case against Nutile. Only Bimbo among the government's potential witnesses spoke with Nutile about the delivery of the packet and only he could give direct evidence on Nutile's knowledge and intent.[4] Even recognizing the importance of Bimbo's testimony, we think that the government's efforts to identify and locate Bimbo were at all times sufficiently diligent and reasonable to pass muster under *Roviaro* and *Davila Williams.* After doing as much as it could to identify Bimbo for the defendants, the government procured Bimbo's arrest as a material witness. His subsequent release on bail and disappearance were certainly not attributable to the government. And we have no basis for disbelieving the testimony of several Secret Service agents that an intensive search was thereafter conducted.

■ Appellants, however, would have us require of the government a level of dili-

gence in keeping track of informers which approaches its zeal in uncovering criminal activity. We are mindful, however, that "[t]he problem is one that calls for balancing the public interest in protecting the flow of information against the individual's right to prepare his defense." *Roviaro v. United States, supra,* 353 U.S. at 62, 77 S.Ct. at 629. We think that the "flow of information" in this case might have been abruptly shut off if Bimbo had been subjected to the fingerprinting and photographing which appellants suggest was necessary to provide fuller identification of Bimbo. We also think that it is highly speculative that such tactics would have resulted in a more accurate identification of Bimbo. Particularly in view of his insistence on dealing with the Secret Service on his own terms, we think that the government's actions in attempting to identify and locate him were all that was reasonably required. We hasten to add, however, that each case dealing with a disappearing informant must be decided on its own facts. In another case where a less substantial showing of good faith and due diligence on the government's part is made, we may be compelled under *Roviaro* and *Davila Williams, supra,* to reverse.

## II. SUFFICIENCY OF THE EVIDENCE.

■ We also reject appellant Nutile's argument that there was insufficient evidence introduced for the jury to have found that he transferred the package containing the counterfeit notes with knowledge of its true contents. The evidence shows that Nutile traveled to Cambridge and retrieved a package from the bay area of a filling station. He then placed the small package in the trunk of his car. We think that the jury could infer that he was concealing the

4. We think that Bimbo's testimony was likely of far less import to Indelicato. The transactions incriminating with respect to Indelicato occurred between Indelicato and a Secret Service agent who testified at trial. Bimbo's role in these transactions was secondary at most and there is no hint in the record of any viable basis for an entrapment defense about which Bimbo could have testified. *See United States*

*v. DeJesus Boria,* 518 F.2d 368, 373 (1st Cir. 1975). It is true that Indelicato's unsuccessful motion to suppress certain wiretap evidence was predicated on the argument that Bimbo's permission to record his telephone conversations was coerced. However, Bimbo's unavailability was not ultimately prejudicial on this point since the government did not introduce any wiretap evidence at trial.

package and hence had guilty knowledge of its contents. An inference that Nutile had knowledge of the contraband character of the packet's contents may be drawn from his statement to Bimbo that the price had gone up from $2,500 to $3,500. Finally, the jury might legitimately infer guilty knowledge from Nutile's rapid disappearance from the scene as Secret Service agents closed in. Considering, these inferences together, it was reasonable for the jury to conclude that Nutile was acting as a courier for Indelicato and that he had knowledge of the contents of the package.

### III. HEARSAY.

Appellant Nutile argues lastly that the trial judge erroneously admitted as against him the Secret Service agent's testimony that Indelicato, just prior to Nutile's arrival with the counterfeited bills, said "My man will be here in a few minutes. Just wait for him here."

Even if we assume that there was error in admitting this hearsay evidence, we think that it was harmless since there is no reasonable possibility that the evidence substantially contributed to Nutile's conviction. *See Chapman v. California*, 386 U.S. 18, 23, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); *Kotteakos v. United States*, 328 U.S. 750, 764–65, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946); *United States v. Kallevig*, 534 F.2d 411 (1st Cir. 1976). Indelicato's statement is probative of the fact that Nutile was acting as Indelicato's agent in obtaining and delivering the contraband. However the relationship between Nutile and Indelicato was also proved by direct observation of the two together and of Nutile actually delivering the package, thus completing the transaction that Indelicato had negotiated. Indelicato's hearsay declaration is not probative of Nutile's knowledge of the contents of the packet, and so could not have been prejudicial on this critical point.[5] Since the challenged statement is only probative of facts also shown by evidence properly before the jury, any error in admitting it was harmless. *See United States v. Gattie*, 511 F.2d 608, 611 (5th Cir. 1975); *United States v. Willis*, 482 F.2d 1034, 1036–37 (8th Cir. 1973). 3 Wright & Miller, Federal Practice & Procedure § 854, p. 361.

*Affirmed.*

---

5. We also think that the possibility of prejudice was minimized by the trial judge's careful instructions to the jury which isolated knowledge as an element of the offense charged and made it clear that the government was required to prove each element beyond a reasonable doubt.