**UNITED STATES of America, Appellee,**

v.

**Teodoro ARIZA–IBARRA, Defendant-Appellant.**

**UNITED STATES of America, Appellee,**

v.

**Alvaro RODRIGUEZ, Defendant-Appellant.**

**Nos. 80–1112, 80–1113.**

United States Court of Appeals, First Circuit.

Argued Sept. 5, 1980.

Decided May 13, 1981.

On Motion for Rehearing June 5, 1981.

Chester Mirsky, New York City, with whom Franklyn Gould, Norman Reimer, and Gould & Reimer, New York City, were on brief, for defendants-appellants.

Justo Arenas, Asst. U. S. Atty., Hato Rey, P. R., with whom Raymond L. Acosta, U. S. Atty., San Juan, P. R., and Jose Ricardo Aguayo, Asst. U. S. Atty., were on brief, for appellee.

Before CAMPBELL and BOWNES, Circuit Judges, and KEETON, District Judge.*

KEETON, District Judge.

Following a new trial ordered by this court in *United States v. Ariza-Ibarra*, 605 F.2d 1216 (1st Cir. 1979) (*"Ariza I"*), defendants Teodoro Ariza-Ibarra ("Ariza") and Alvaro Rodriguez ("Rodriguez") were again convicted by a jury of conspiracy to import 50,000 pounds of marijuana and 25 kilos of cocaine from Colombia into the United States in violation of 21 U.S.C. §§ 952(a), 963. On this appeal, we are required to address an issue left open in *Ariza I*, 605 F.2d at 1219–20 n.3, concerning the scope of the government's duty under *Roviaro v. United States*, 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957), and *United States v. Davila Williams*, 496 F.2d 378 (1st Cir. 1974), to provide a defendant with accurate information concerning the whereabouts of a confidential informant.

The government's theory of the case remained the same at the second trial as in *Ariza I*:

As portrayed by the prosecution, Ariza was a Colombia-based supplier of drugs, while Rodriguez—who dealt in vessels suitable for drug smuggling—was one of his lieutenants. Both defendants were arrested in the afternoon of January 31, 1978 at the international airport in San Juan. Their capture followed an undercover operation in which Drug Enforcement Administration (DEA) agents and an informer posed as would-be drug purchasers. Meeting with defendants on January 30 and 31, the undercover operatives made final arrangements to procure from them a shipment of Colombian cocaine, with a marijuana deal to follow. Before any part of the transaction was consummated defendants went to the airport; fearing that they were planning to depart, DEA agents arrested them. Defendants were not charged with commission of any substantive offense, but rather with the conspiracy to import that was allegedly hatched in the presence of the undercover operatives.

605 F.2d at 1218–19.

The prosecution's evidence at the second trial was in all relevant respects identical to that summarized in *Ariza I, id.* at 1219–20. We state only that the government's case was largely dependent on the testimony of Fortunato Jorge, the DEA agent who, along with an informant named Alberto Larain Maestre ("Larain"), negotiated the agreement to purchase drugs from the defendants that constituted the alleged conspiracy. At trial, Jorge testified that he learned about Ariza from Larain in November 1977. Shortly thereafter, the two men began a series of telephone calls to Ariza, which were taped by Jorge and placed in evidence at trial. None of the taped conversations included any express reference to drugs. Instead, there were "[g]uarded references to 'coffee' and 'furniture' [which] could well have been cover words for other substances, and the conversations were so deliberately cryptic as to suggest illicit rather than ordinary commercial dealings." *Id.* at 1219.

In addition, Jorge testified concerning several face-to-face meetings with the de-

---

* Of the District of Massachusetts, sitting by designation.

fendants, at which both he and Larain were present, where an agreement was reached that Ariza, with Rodriguez' assistance, would supply the men with 25 kilos of cocaine and 50,000 pounds of marijuana. None of the face-to-face meetings with the defendants was recorded. As was true in *Ariza I*, at the second trial "[i]t was Jorge's testimony of what defendants said at the later, unrecorded, meetings that provided the government with its basic case." *Id*.[1]

Larain was not called as a witness by the government or the defense at either trial. Appellants argue that at the second trial, the government violated its duty under *Davila Williams* by failing either to furnish the defense with accurate information concerning the informant's whereabouts or to exercise reasonable diligence under the circumstances to locate him. In addition, they assert that the government deliberately withheld information concerning Larain's whereabouts. Finally, appellants argue that the district court erred in denying their request for a missing witness instruction. To set the context for evaluating appellants' contentions, we describe the proceedings occurring before and during the second trial in some detail.

## II.

### A. PROCEEDINGS BEFORE THE SECOND TRIAL

On September 30, 1979, in *Ariza I*, this court reversed defendants' convictions and remanded the case for a new trial. On November 21, 1979, a pretrial conference was held before Magistrate Simonpietri at which an Assistant United States Attorney and Rodriguez' lawyer were present.[2] In his memorandum on the conference, dated November 27, 1979, the magistrate reported that "it was agreed that the Government

will inform the defendants, by not later than November 29, 1979, [of] the present status of its informant." No transcript of the pretrial conference before the magistrate is in the record. However, the parties do not dispute that at the conference, defense counsel announced that he wished to interview Larain, and the Assistant United States Attorney responded that Larain was no longer active as an informant and that he did not know where Larain was.

On December 3, 1979 Rodriguez' attorney, who was then in New York, wrote to the prosecutor in charge of the case. to discuss various pretrial matters, including Larain's whereabouts:

> In the event that you have been unable to locate Larain, we would appreciate information in this behalf and that you make it available to us. When we last appeared before the Magistrate in the instant case, you represented that Larain was no longer in the service of the Drug Enforcement Administration and that his whereabouts were unknown to you. If this situation has changed, we would appreciate, of course, hearing from you.

This letter was received by the U.S. Attorney's office in San Juan on December 6, 1979.

The government did not furnish the defense with any information concerning Larain's whereabouts, in response to either the magistrate's memorandum or defense counsel's letter, before December 10, 1979, the date on which the second trial commenced.

### B. THE *Petrozziello* HEARING

On December 10, 1979, after impaneling the jury, the district court recessed the trial and convened a hearing on the admissibility of certain statements allegedly made by two of the defendants' purported co-con-

---

1. The remainder of the government's evidence was circumstantial. Two witnesses testified concerning the defendants' arrest, when Ariza was found with $5,000,000 in cashier's checks in his shoe. Two other witnesses described the volume and frequency of large cash transactions in Ariza's bank account around the time the alleged conspiracy was hatched. Finally, two witnesses described modifications ordered by Rodriguez to enlarge the storage capacity of his ship, the *Wendy B.*

2. Both defendants retained new counsel for the second trial. Rodriguez' new attorney made his first appearance at a status conference on October 26, 1979. Ariza's trial counsel filed a written petition for admission on November 27, 1979.

spirators. *See United States v. Petrozziello*, 548 F.2d 20 (1st Cir. 1977).[3] The court also agreed to take up the issue of Larain's availability at the *Petrozziello* hearing.[4]

After the hearing began, the government furnished defense counsel with several documents bearing on Larain's movements during the period between the first and second trial. On the first day of the hearing, the prosecutor gave defense counsel a copy of a memorandum prepared by a DEA group supervisor in San Juan in September 1978, which indicated that Larain was being "deactivated," *i. e.*, removed from active informant status. The September 1978 report made reference to an April 1978 report on Larain's activities. When defense counsel requested it, the prosecutor stated that the government had not been able to locate that report. The next day, the prosecutor produced the April 1978 report, in which the DEA group supervisor described three investigations on which Larain had worked. The report indicated that "[s]ince the conclusion of the above investigations, [Larain] and his family have relocated themselves in the United States."[5] The author indicated that Larain would remain on active status and maintain contact to initiate additional drug cases.

In addition, on the second day of the hearing, defendants were given copies of two DEA memoranda concerning Larain's moiety claims arising out of the case. The first memorandum, dated January 2, 1979, informed Ronald Siebert, the Special Agent-in-Charge of DEA's San Juan office, that Larain's claim for compensation with respect to the seizure of a boat belonging to Rodriguez had been granted, but that his moiety claim relating to the $5 million found on Ariza at the time of his arrest had been denied by the agency. Siebert was told to refer Larain to the Internal Revenue Service, which had seized the funds, and was instructed to have Larain sign an agreement accepting the compensation granted. The second memorandum, dated January 24, 1979, requisitioned a check for $13,080.97 to be forwarded to Larain in care of Siebert.

Agent Jorge was the government's first and only witness at the *Petrozziello* hearing. After testifying at length concerning the conspiracy between the defendants and one of the hearsay declarants, Jorge was questioned by the government concerning Larain's whereabouts. On direct, Jorge testified that he had last worked with Larain about one year earlier, and that although he had last seen Larain about two and a half months before the day he testified at a meeting arranged by Larain at a restaurant near the Federal Courthouse in San Juan, Jorge had not asked Larain where he was living at that time.

Jorge indicated that the last address he had for Larain was an apartment in the Laguna Gardens in Carolina, Puerto Rico. Jorge stated that Larain had lived at the Laguna Gardens address before and during the first trial, and that he had furnished that address to defense counsel in the first proceeding. At the hearing, Jorge said that he had telephoned the apartment recently and was informed by a woman who answered that Larain no longer lived there.

During cross-examination, Jorge stated that Larain had never testified in any of the several cases on which the two men had

---

3. In *United States v. Ciampaglia*, 628 F.2d 632, 637–38 (1st Cir. 1980), we held that a final *Petrozziello* ruling should not be made until the close of all the evidence. *See also United States v. Patterson*, 644 F.2d 890 at 896 (1st Cir. 1981). A district court remains free, however, to hold an earlier hearing for the purpose of making a conditional ruling. *See Ciampaglia*, 628 F.2d at 638 & n.3.

4. At various times during the hearing, the district court indicated that it was hearing evidence to determine "whether [Larain] is available equally to [the defense] as to the govern-

ment," and "whether [the government is] in fact withholding his present whereabouts." Because there had not yet been a formal request to produce Larain, a request for a subpoena, or a request for a missing witness instruction, the record does not make clear why the district court heard evidence on these questions at the *Petrozziello* hearing.

5. The evidence received at trial indicates that Larain had not permanently relocated in the United States. *See* pp. 11–13, *infra*.

worked. The defense established that although Jorge had not promised Larain that Larain would never be required to testify in a trial arising from one of his investigations, Jorge had told Larain that the government would avoid depending on him in its cases.

In addition, Jorge testified that although he had been asked by an Assistant United States Attorney whether he knew Larain's whereabouts, he had never been instructed to locate Larain. According to Jorge, the one phone call to the Laguna Gardens apartment constituted Jorge's only effort to find Larain.[6]

At the conclusion of the government's evidence, defendants called Agent Siebert on the issue of the government's knowledge of Larain's whereabouts. Siebert testified that he had last seen Larain three or four months earlier during an accidental encounter in the lobby of the Condado Holiday Inn. The two men exchanged pleasantries, but Siebert did not attempt to find out where Larain was then living or working.

Siebert's testimony on what efforts the agents made to locate Larain is somewhat contradictory. At one point, he stated that Jorge's telephone call to the Laguna Gardens apartment was the only such attempt of which he was aware. Shortly thereafter, Siebert testified that he was sure Jorge had telephoned Larain's previous address "several times."

Following Siebert's testimony, the district court ruled that defense counsel had known "not only of the existence of the informant... [but] of the address of the informant." Then, after reading from *United States v. Turbide*, 558 F.2d 1053, 1060 n.6 (2d Cir.), *cert. denied*, 434 U.S. 934, 98 S.Ct. 421, 54 L.Ed.2d 293 (1977), ("[A] defendant who knows the informer must show that he has made a diligent attempt to locate him before relief will be ordered...."), the court found that in the instant case the defense had not made the showing required by *Turbide*.

In response, Rodriguez' attorney stated that current defense counsel first learned that Larain's address had been given to the previous defense attorneys during Jorge's testimony at the *Petrozziello* hearing. He stated that defendants had relied on what he characterized (erroneously, we note)[7] as a finding of this Court in *Ariza I*, that his predecessors had not been furnished with Larain's address. At that point, the court ruled that defense counsel had not

> shown any effort that you have made to contact [Larain] and ... haven't established by any evidence ... that the government has in any way impeded your effort in trying to find Mr. Larain ... [T]he evidence before me does not show that the government has any knowledge any more than you do as to where he is now.

**6.** At the *Petrozziello* hearing, the government stipulated that Jorge's efforts to find Larain were limited to the single telephone call to the Laguna Gardens apartment.

**7.** Footnote 3 in *Ariza I* states:

> At one point during the trial, after defense counsel had objected to the testimony about Larain and said, "We are entitled to cross-examine that fellow," the prosecutor said, "You can subpoena him." The record shows that defense counsel then said "Where?" and that there was no response. While the government did not then produce Larain's address, as it would have been required to do under *Roviaro v. United States*, 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957), in response to a proper request by defendant, there is no indication that the defense ever made an explicit request. At oral argument in this court, the government represented that it had an understanding with Larain that he would

> not have to testify at trial, a statement that raises questions as to the government's intentions and capabilities under *Roviaro*. As a new trial must be held in any event, we do not decide whether defendants' rights under *Roviaro* were in any way implicated.

*Id.* at 1216–17. It is apparent from the text of this footnote that this Court made no finding concerning whether the government had furnished Larain's address to defense counsel at the first trial. We note that attorneys different from defense counsel in either trial argued defendants' appeal in *Ariza I*.

We note also that although one of the defense attorneys from the first trial was seated in the courtroom during the second trial, defendants declined to call him to ask whether he had been given Larain's address during the first trial, because they stated his testimony would be ambiguous on the issue.

After close questioning by the court, defense counsel conceded that "[t]he defense has made no efforts whatsoever to look for the government's confidential informant as far as this record is concerned."

Following a recess, defense counsel made their first request on the record that the government be ordered to produce Larain.[8] The court then asked the Assistant United States Attorney if he knew where Larain was. The prosecutor responded that he did not. Shortly thereafter, the court concluded that:

> [B]ased on the record before me, I rule that [the defense] can see [Larain], and if the government has any knowledge as to where he is they will make it available to ... counsel for the defense, so they can make whatever arrangements they feel are proper.

In his response the prosecutor stated that "my agent [will] continue to find out where he is... [T]he government is aware of its continuing duty, if they find where he is, to inform counsel for the defense."

## C. THE SECOND TRIAL

After the opening statements, the government called Agent Jorge as its first witness. On cross, Jorge's testimony concerning Larain was substantially similar to that given at the *Petrozziello* hearing. The agent repeated his testimony that he had told Larain that the government would not depend on his testimony, but that it could not guarantee that Larain would not be required to testify. At trial, he added that he had informed the Assistant United States Attorney of this understanding.

Jorge also repeated his prior testimony that he had made no efforts to find Larain by visiting his previous address or tracing the compensation checks. However, when pressed by defense counsel on his efforts to find Larain, Jorge stated, "I have no need to locate him. Nobody has told me that I have to locate him or even try."[9]

Immediately after his testimony was completed, Jorge was excused. None of the government's six other witnesses provided any information concerning Larain's whereabouts.

The defense called five witnesses familiar with Ariza's and Rodriguez's business interests, to testify about why Ariza would travel with large amounts of money, and why Rodriguez had ordered modifications on one of his ships. On the morning of December 19, 1979, the eighth day of the trial, the defense announced that it would call Agent Siebert to rebut Jorge's testimony concerning the government's efforts to learn of Larain's address. However, before Siebert began to testify, there was a prolonged sidebar conference at which defendants argued that they ought to be allowed to place before the jury evidence that the government had failed to comply with the agreement it made before the magistrate. Relying once again on *United States v. Turbide, supra,* the district court ruled that because the defendants had known of Larain since before the first trial, and had not made any effort to locate Larain, the government was under no obligation to attempt to locate him.

Shortly thereafter, the court recessed the trial for lunch. After the recess, Quiles, the Assistant United States Attorney, announced that during the break, an attorney who was visiting his office on other matters had informed the prosecutor that he had seen Larain two weeks earlier at the Condado Holiday Inn in a nightclub called the El Casanova Lounge. According to the attor-

---

**8.** Defendants' counsel stated that:

It is the defendant's position that the informant... is not in the hands of the defense. We wish to speak with him. We believe that the prosecution either knows, or knew where he was; that he is in every sense... under their control, and we, at this point, still wish to speak with him... with a view, of course, to call him as a witness for the defense.

And if he is not produced, we would request a missing-witness charge.

**9.** This statement is contradicted by Siebert's statement at the *Petrozziello* hearing that he had asked his agents to find Larain, by Siebert's subsequent testimony at trial that he had instructed Jorge to find the informant, and by the prosecutor's representation that his agent would "continue to find out where he is...."

ney, Larain owned the nightclub, and was using his own name. The prosecutor furnished defense counsel with this information and learned from them that they were also staying at the Condado Holiday Inn. Defense counsel then requested a picture of Larain. After the prosecutor offered to provide the most recent photograph of the informant he could find,[10] the court asked defense counsel, "Does that satisfy you?" Ariza's attorney responded, "Certainly, Judge, we have all we can get."

The defense then called Agent Siebert. The agent's testimony at the trial differed from that given at the *Petrozziello* hearing in two significant respects. First, at trial Siebert testified that he knew Larain had had a nightly show at the Condado Holiday Inn that had disbanded within the past six months. Second, the agent stated that during their accidental encounter at the Holiday Inn, Larain had stated that he was then working at the hotel.

In addition, Siebert was questioned concerning the government's efforts to find Larain. Contradicting Jorge's testimony, Siebert stated that about two months earlier, he had instructed Jorge to find the informant. Siebert indicated that Jorge told him that the agent had telephoned Larain's apartment numerous times and "tried" the Holiday Inn as well.

Shortly thereafter, during a brief sidebar conference, the prosecutor stated that after receiving a copy of *Ariza I*, he called Siebert and asked him to determine Larain's whereabouts. Defense counsel again pressed Siebert on what efforts Jorge had made to find Larain. In addition to the telephone calls, Siebert stated that Agent

Jorge had told him that he had visited Larain's former apartment and talked with a guard.[11]

The last witness for the defense was Justo Arenas, the Assistant United States Attorney who argued on behalf of the government in *Ariza I*.[12] At the conclusion of Arenas' testimony, the court recessed the trial, informing defense counsel, "I am going to give you the opportunity to search for this gentleman tonight in the same place... where you are staying."

At the opening of trial the next day, defense counsel informed the court that they had gone to the Condado Holiday Inn to look for Larain the previous evening. They reported that a person at the desk had told them that Larain had managed a nightclub at the Inn. At the nightclub, the attorneys were informed that Larain had not been connected with the establishment for some months. Counsel then talked to employees of the hotel's restaurant, who suggested they go to a restaurant called the Don Pepe. At the Don Pepe, the attorneys were told that Larain usually visited the restaurant three or four times each week and had been there during the previous week. Defense counsel informed the court that they waited at the Don Pepe for "two or three hours," and Larain did not appear.

The defendants did not move for a continuance to give them additional time to search for the informant. They did not request a subpoena or missing witness arrest warrant to secure the government's assistance to find him. Instead, renewing their request for a missing witness instruction, defense counsel argued that the fact

---

10. Quiles said he would check the government's files for a current picture of the informant. The prosecutor also revealed that he and Larain had attended high school together and offered to give defense counsel the picture of Larain contained in his high school yearbook.

11. Siebert's testimony on this subject conflicts with Jorge's testimony that no one had told him to find Larain, that he had not done anything to find the informant other than once calling the Laguna Gardens apartment, and the government's stipulation to the same effect.

12. At oral argument on that appeal, Arenas represented that the government had an understanding with Larain that the informant would not have to testify at trial. *See Ariza I*, 605 F.2d at 1219–20 n.3 and n.7, *supra*. At the second trial, Arenas testified that he had an impression that there was an agreement that Larain would not have to testify, but that his impression was not based upon any statement made by Jorge or any other DEA agent or by any member of the U.S. Attorney's Office.

that it had taken them only "twenty-two minutes" to place Larain at a spot where he was a frequent visitor proved that the government had made no real effort to locate the informant. In addition, they contended that Agent Siebert's failure to mention at the *Petrozziello* hearing that Larain had been connected with a nightly show at the Holiday Inn indicated that the government had intentionally withheld relevant information from defense counsel. Finally, the defense stated the following:

> Every person we spoke to yesterday was pleasant and Alberto [Larain], no one whispered his name. They told us things about him.... Your Honor, it was easy.

In its ruling, the district court first noted that there was no evidence in the record that at the pretrial conference the defendants had requested the government to do anything more than report on Larain's current status. Then, accepting defense counsel's representations concerning what had happened the night before as true, the court stated:

> [T]he statement of counsel [is] a two-edged sword because it demonstrates to me that [if] there was some effort, and not very much, I would say, Mr. Larain can or could have been located by the defense and they certainly didn't have to rely on the information they received yesterday. But [if] Mr. Larain is [as] popular as he seems to be, then it would seem to me that with some minor effort he could have been located.

Noting that the defense had offered evidence on Ariza's sizeable wealth to explain why he had $5 million in cashier's checks on his person when he was arrested, the court stated that the defendants could have afforded to hire an investigator, and, because Larain's name and last whereabouts were known, could have located and subpoenaed the informant or sought a material witness arrest warrant from the court. On the evidence before it, the court found "that

Mr. Larain is just as available to the defense as he is to the government ...,"[13] and denied the request for a missing witness instruction.

Following this ruling, the parties made their closing arguments. Both defendants argued that the jury should draw a negative inference from the government's failure to produce Larain, and its agreement with the informant not to rely on his testimony. In its rebuttal, the government explained that it had not called Larain because he was a paid informant with a criminal record whose credibility would have been questioned on the stand.

### III.

Appellants' first argument is that in holding that defendants were required to establish that they had made some effort to find the informant before it would compel the government to locate him, the district court applied an incorrect legal standard, by reason of which this court should reverse their convictions. We have observed that "the government's duty with respect to *production* of an informant, as distinguished from its duty to merely name the informant, is not easily stated." *United States v. Diaz*, 535 F.2d 130, 134 (1st Cir. 1976) (emphasis in original). The leading case is *United States v. Davila Williams, supra,* in which this court declared that:

> [T]he government's duty under *Roviaro* to produce names and addresses requires it to produce correct information or at least to have exercised diligence reasonable under the circumstances to locate the informer.... *How far it must go to keep track of, or search for, an informer is less easily stated; that depends on many factors including the extent of the government's control over the witness, the importance of the witness's testimony, the difficulty of finding him, and similar matters.* We do not accept a flat rule requiring production of all informer

---

**13.** In so finding, the court stated that Larain's involvement in three open cases prepared by DEA was insufficient to establish that the informant was in the government's control, in light of the government's agreement not to call Larain as its witness and the fact that he was no longer an active informant.

witnesses whenever the government has not disclosed their names before trial. . . . But should an informer disappear or become unavailable to the defense, we would compel the government, upon timely demand, either to locate him or make an affirmative showing satisfactory to the court why it could not reasonably be expected to do so and of its diligence generally as regards the disappearance. 496 F.2d at 382 (citations omitted and emphasis supplied).

There is no dispute that, at least by the commencement of the *Petrozziello* hearing, the defendants had requested the government to provide them with Larain's address at the time of the second trial. The government did not do so, claiming that Larain was no longer an active informant and that his current whereabouts were unknown. Instead, at the *Petrozziello* hearing, Jorge testified concerning the informant's Laguna Gardens apartment, where, the agent admitted, Larain was no longer living. In addition, Agent Siebert described an accidental encounter with the informant that had taken place some months earlier at the Condado Holiday Inn.[14] The agents' testimony, and the DEA memoranda concerning Larain's deactivation, his "relocation" on the mainland, and his moiety claims, constituted all the information given to the defendants by the government at or before the *Petrozziello* hearing that might reasonably have aided them had they sought to search for Larain. On the basis of this information, and a finding that previous defense counsel had been given the Laguna Gardens address at the earlier trial, the district court ruled, relying on *United States v. Turbide, supra,* that the defendants knew Larain, and were therefore not entitled to government assistance in locating him because they had not made any effort to find him.

The district court's ruling is inconsistent with our conclusion in *Davila Williams* that

the government's duty with respect to production of an informant "is dependent on several factors, among them the extent of the government's control of the witness, the importance of the witness' testimony, and the difficulty in finding the witness." *United States v. Diaz, supra,* 535 F.2d at 134. In *United States v. DeJesus Boria,* 518 F.2d 368, 373 (1st Cir. 1975), we stated that *Davila Williams* "made it clear that the bare furnishing of a name and non-usable address might not suffice if, with reasonable diligence, the Government could locate the informer." Where the defendant had requested the informant's address, searched unsuccessfully for him, and then moved for an order requiring the government to produce him, we concluded that "the government's flat refusal even to consider doing more [than providing defense counsel with a non-usable address] . . . did not meet *Williams'* standards." *Id. See also United States v. Nutile,* 550 F.2d 701, 704 (1st Cir. 1977) (Where "the government was unable accurately to identify the whereabouts of its informer . . . we . . . inquire[d] in light of . . . *Davila Williams, supra,* as to the adequacy of its efforts to locate [him].")

■ Jorge's one telephone call to the Laguna Gardens apartment is the only governmental effort to locate Larain as to which there is clear evidence in the record.[15] The government does not, and could not, contend that the single call constitutes diligent effort to locate the informant. *See United States v. Nutile, supra,* 550 F.2d at 703–04. Moreover, despite the prosecutor's representation at the conclusion of the *Petrozziello* hearing that his agent would "continue to find out where [Larain] is," Agent Jorge testified five days later that "[n]obody has told me that I have to locate [L]arain or even try." Thus, even after it had assumed an obligation to locate the informant, the government did not instruct Larain's former partner of the need to do so.

---

**14.** Siebert's failure to disclose at the *Petrozziello* hearing that Larain had had a show at the nightclub in the Holiday Inn is discussed in part IV, *infra.*

**15.** Agent Siebert's testimony concerning other attempts by Jorge and other agents to find the informant are hearsay and are contradicted by Jorge's own testimony. *See* n. 11, *supra.*

Applying the factors listed in *Davila Williams* to the facts of this case, we would be compelled to reverse the convictions were we not convinced that appellants were in no way prejudiced by the government's failure to search for Larain. Rather than showing that they desired the testimony of the informant, defense counsel's conduct throughout the trial "suggests strongly that [they] desired grounds for reversible error," *cf. United States v. Bonilla*, 615 F.2d 1262, 1264 (9th Cir. 1980) or for obtaining a missing witness instruction, *cf. United States v. Davila Williams, supra*, 496 F.2d at 382–83.

Throughout the pretrial maneuvering in this case, appellants never formally requested the government to produce its informant. When they finally did so, on the third day of the *Petrozziello* hearing conducted after the second trial had commenced, in the very next sentence defense counsel renewed their request for a missing witness instruction. *See* n. 8, *supra*. As we stated in *United States v. Diaz, supra*, 535 F.2d at 135 n.5, "[t]he request for such an instruction sometimes indicates that defense counsel is more interested in exploiting the witness's absence than seeing him produced." Appellants' complete failure to take any actions consistent with a sincere interest in obtaining the informant's testimony leads us to conclude, as the district court apparently concluded,[16] that their objective throughout the proceedings was not to obtain Larain's testimony but to obtain a tactical advantage at trial and on appeal from his absence.

As the district court noted, although the defendants introduced evidence indicating that Ariza is a man with considerable wealth, they did not hire an investigator to search for the informant. *Cf. United States v. DeJesus Boria, supra*, 518 F.2d at 371 (in which the defendant moved for an appointment of an investigator to aid him in finding an informant). They never attempted to subpoena the informant, *see United States v. Russo*, 540 F.2d 1152, 1154–55 (1st Cir.), *cert. denied*, 429 U.S. 1000, 97 S.Ct. 529, 50 L.Ed.2d 611 (1976), or to obtain a bench warrant requiring the government to secure his presence at trial, *see United States v. Fera*, 616 F.2d 590, 597 (1st Cir.), *cert. denied*, 446 U.S. 969, 100 S.Ct. 2951, 64 L.Ed.2d 830 (1980). Throughout the proceedings, defendants never made an offer of proof concerning how Larain's testimony might aid their case. *See United States v. DeJesus Boria, supra*, 518 F.2d at 368.

Finally, on the ninth day of trial, after visiting the Condado Holiday Inn and the Don Pepe restaurant and determining that Larain frequented the latter several times each week, defense counsel informed the court how easy it was to obtain information about Larain. Yet, although they possessed information that caused the district court to find that with some effort defendants could locate the informant, defense counsel did not seek a continuance to allow them to press their search for Larain. *Cf. United States v. Davila Williams, supra; United States v. Haldeman*, 559 F.2d 31, 83 (D.C. Cir.1976), *cert. denied*, 431 U.S. 933, 97 S.Ct. 2641, 53 L.Ed.2d 250 (1977). Instead, they

**16.** Shortly before the conclusion of the *Petrozziello* hearing, the following exchange took place:

> THE COURT: [Larain] is a man whose name you have known for two years and whose address you have known for some time.... [Y]ou haven't indicated to the Court that you have made any effort, [y]ou haven't shown one iota of effort ... trying to locate him.
>
> [Defense Counsel]: Your Honor, okay, let me ask you this—
>
> THE COURT: As a matter of fact you know what this leads me to believe, ... it leads me to believe not only [from] this hearing but from what I read of the Court of

Appeals case, I am not so sure you really want to locate him.

> [Defense Counsel]: I would love to speak with him, Your Honor, and I think that we have certain evidence I would be delighted to give it to the Court that I think that Larain would be seriously concerned with confronting Your Honor if he appeared here. As a matter of fact, Your Honor, Larain could only lessen the input of the government's case ... because ..., if he was a valuable witness, ... the government certainly would have him here.

This last statement constitutes the nearest thing to an "offer of proof" concerning how Larain would testify if called.

simply renewed their request for a missing witness instruction. After learning of Larain's frequent visits to the Don Pepe, there is no indication that, with some diligence, defense counsel could not have located the informant. *See United States v. Russo, supra,* 540 F.2d at 1155. In the absence of a credible showing that Larain's testimony would be helpful to appellants' case, *see id.* and n. 16, *supra,* we do not believe that rewarding appellants' tactics with a new trial would either serve or honor the "fundamental requirements of fairness" that *Roviaro* and *Davila Williams* were designed to foster. *Roviaro v. United States, supra,* 353 U.S. at 60, 77 S.Ct. at 627.

## IV.

Appellants' second contention is founded on essentially the same facts as the first but asserts a different legal theory. Their contention is that the charges against the defendants should be dismissed because the government deliberately withheld and mischaracterized information concerning Larain's whereabouts in violation of their right to due process. In substance, appellants' allegations of prosecutorial misconduct are threefold: First, that despite their pretrial requests, the government withheld all *Roviaro* information from defendants until the first day of trial. Second, that at the *Petrozziello* hearing, Agent Siebert failed to disclose that Larain had recently been working at the Condado Holiday Inn. Third, that at the *Petrozziello* hearing, the government misled defendants by characterizing the Laguna Gardens apartment as the informant's last known address when more recent information concerning his whereabouts was available. We examine the facts underlying these claims before addressing the consequences of the government's conduct.

**17.** In its brief, the government suggests that there was evidence that a "contract" had been placed on the life of Agent Jorge before the first trial as a result of his actions in this case, and that therefore the prosecution was properly concerned with the safety of its informant. We note, however, that the government did not make any references to the contract on Jorge at the second trial, and did not assert any privi-

## A.

As we have stated above, defendants first made known their interest in Larain's whereabouts at the pretrial conference before the magistrate on November 21, 1979. At that time, the prosecutor told defense counsel that he did not know Larain's address and agreed to inform them of Larain's status by November 29, 1979. On December 3, 1979, defense counsel wrote to the prosecutor asking to be informed if Larain's whereabouts became known. That letter was received by the prosecutor on Thursday, December 6, 1979. The government did not supply defendants with any information concerning Larain until Monday, December 10, 1979, the first day of the trial.

■ When a defendant makes a request for information concerning an informant's whereabouts, the government should comply promptly, unless it asserts a privilege under *Roviaro* not to do so. *See Roviaro v. United States, supra,* 353 U.S. at 59–62,[17] 77 S.Ct. at 627–628. In light of the clear indication that Larain's availability might be an issue at the new trial, *see Ariza I,* 605 F.2d at 1219–20 n.3, and the impending trial, the government's delay in responding to defendants' request does not constitute prompt compliance.

Although Special Agent Siebert possessed knowledge relevant to Larain's whereabouts, the government did not call him as its witness at the *Petrozziello* hearing. When called by the defense, Siebert revealed his accidental encounter with Larain at the Condado Holiday Inn some months before, and made a reference suggesting some knowledge of the informant's contacts with the hotel.[18] However, at the hearing

lege from providing evidence concerning Larain's whereabouts.

**18.** During the hearing, the following exchange took place:

Q. Other than what you think Jorge may have done, any other efforts that you know that were made by anybody to locate Mr. Larain within the past two years?

the agent never indicated, as he later would at trial, that Larain had had a nightly show at the Holiday Inn or that the informant had told him during their chance meeting that he was working at the hotel.

If, when requested by a defendant to produce an informant, the government seeks to thrust the burden of locating the witness on the defense, at the very least it has an obligation to supply the defendant with all information that might reasonably be helpful in the search. Because Larain's business involvement with the Holiday Inn was likely to lead to fresh information concerning his whereabouts, Siebert's failure to reveal this fact at the *Petrozziello* hearing constituted a breach of this obligation.

Citing *United States v. DeJesus Boria, supra*, appellants argue that in furnishing defendants with Larain's "last known address" the government mischaracterized the information in its possession concerning Larain's whereabouts. This argument is without merit. In *DeJesus Boria*, the prosecution gave the defense what it described as the informant's "last known address" some time after a government agent had taken him to the airport to leave the jurisdiction. Rejecting the district court's finding that the prosecution's disclosure had been adequate, we stated that "[f]urnishing the informer's 'last known address' implied that the Government was furnishing its most current information about the informer's whereabouts." *Id.*, 518 F.2d at 372. In the instant case, when Agent Jorge testified concerning the Laguna Gardens address, he clearly stated that Larain no longer lived there. Thus, unlike *DeJesus Boria*, here the government did not represent that the address it supplied to the defendants was current.

### B.

In *United States v. Davila Williams, supra*, we stated that "[i]t would be serious misconduct for the government intentionally to withhold or falsify the *Roviaro* information." 496 F.2d at 382. Our later decisions have made it clear that in each instance where an allegation of such behavior is made, the court must determine whether "the Government's conduct was so reprehensible as to necessitate reversal in our supervisory capacity or . . . . [whether] there was such prejudice to appellant as might otherwise require reversal." *United States v. DeJesus Boria, supra*, 535 F.2d at 373. *See United States v. Houghton*, 554 F.2d 1219, 1223–25 (1st Cir.), *cert. denied*, 434 U.S. 851, 98 S.Ct. 164, 54 L.Ed.2d 120 (1977).

Unlike the cases cited by appellants, here the government did not remove its informant from the jurisdiction, *United States v. Calzada*, 579 F.2d 1358, 1362 (7th Cir.), *cert. denied*, 439 U.S. 920, 99 S.Ct. 294, 58 L.Ed.2d 266 (1978); *United States v. Mendez-Rodriguez*, 450 F.2d 1 (9th Cir. 1971), or otherwise prohibit the witness from testifying. *See Washington v. Texas*, 388 U.S. 14, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967). We do not condone the government's misconduct in this case, but we do not consider a dismissal to be appropriate in the absence of some showing of prejudice by the defendants. *See United States v. DeJesus Boria, supra.*

We turn next to the issue of prejudice: In the present case, citing the government's agreement not to rely on Larain's testimony and the DEA memorandum suggesting that the informant had moved to the mainland, appellants argue that as a result of its failure to search for Larain and to supply the *Roviaro* information in a timely manner, "the Government affirmatively denied the appellants access to the informant . . . [and] was clearly complicitous in [his] unavailability." Brief for Appellants

---

A. Other than by telephone to his previous home address, other than checking at the Condado Holiday Inn, no, I don't.

Q. Yet when you saw him you passed the time of day and let him go, is that right?

A. We exchanged a few comments and that was the size of it, yes.

In light of Siebert's testimony at trial that he knew Larain had worked at the Holiday Inn, it is hard to understand why this statement did not jar Siebert's memory concerning Larain's association with the hotel or provoke further questioning by defense counsel who were purportedly intent on finding the informant.

59. However, as is discussed in part V, *infra*, the ease with which defense counsel were able to obtain information leading them to a restaurant frequently visited by Larain rebuts their contention that the informant *was* unavailable at the time of the second trial. Where prosecutorial misconduct affecting the availability of a witness is proved, a court weighing a claim of prejudice may appropriately take into account the difficulty of obtaining relevant evidence. But, in assessing the likelihood of prejudice, a court must also take into account a defendant's lack of effort to pursue known leads. In light of the complete absence of evidence that Larain's testimony would be helpful to the defendants and their failure to undertake any efforts consistent with a desire to locate the informant, *see* part III, *supra*, we hold that no prejudice to the defendants resulted from the government's misconduct in this case.

## V.

■ Appellants' final argument is that the district court erred in denying their request for a missing witness instruction. The government contends that defendants failed to object to the court's charge and that therefore on appeal this court's review should be limited to determining whether it was "plain error" to deny the request. Fed. R.Crim.P. 30, 52. *See United States v. Thomann*, 609 F.2d 560, 565 (1st Cir. 1979). We agree that on the record before us [19] appellants' contention fails because of the absence of an objection to the charge and their failure to show that it was "plain error" not to give a missing witness instruction. We conclude that the appellants' contention must be rejected on other grounds as well.

Citing *United States v. Johnson*, 467 F.2d 804 (1st Cir. 1972), *cert. denied*, 410 U.S. 909, 93 S.Ct. 963, 35 L.Ed.2d 270 (1973), appellants argue that Larain's former status as a paid informant suggests that "he would undoubtedly be expected to favor the government" and that the district court erred in failing to give sufficient weight to his relationship with the government in determining whether the informant was available to both sides. In *Johnson*, we held that:

[a] witness's availability is not to be decided on the basis of his physical presence in the court room or his accessibility by writ of habeas corpus or by subpoena.... [A] witness's practical and legal availability is to be determined on the basis of his disposition and relationship toward the parties.... Where the court finds that an uncalled witness is clearly favorably disposed toward one of the parties, an instruction, if requested, may properly be given that the jury may draw an inference favorable to the other party.... In those cases where the bias or disposition of an uncalled witness is not able to be ascertained, "the failure to produce is open to an inference against both parties, the particular strength of the inference against either depending on the circumstances." (Emphasis deleted.) 2 Wigmore on Evidence § 288, at 171 (3d ed. 1940).

*Id.* at 890 (citations omitted). *See United States v. Wright*, 573 F.2d 681, 684 (1st Cir.), *cert. denied*, 436 U.S. 949, 98 S.Ct. 2857, 56 L.Ed.2d 792 (1978). Because our statement in *Johnson* regarding "disposition" of the witness may appear to be in conflict with language in subsequent opinions suggesting that a witness' "availability" is solely determined by the feasibility of obtaining his testimony at trial, *United States v. Diaz*, 535 F.2d at 135, n.5, *United States v. Davila Williams*, 496 F.2d at 383, we examine the rationale for missing witness instructions in some detail.

■ In the absence of a satisfactory explanation, when a party fails to call a witness whom that party would ordinarily produce if the facts known by the witness were favorable to that party, the jury may infer that the absent witness's testimony

---

**19.** At oral argument appellants represented that there had been a timely objection to the charge. However, the record does not show that defendants made any objections to the instructions given by the district court.

would have been adverse to that party. *See* 2 Wigmore, Evidence §§ 285–88 (Chadbourn rev. 1979). This adverse inference may not reasonably be drawn, however, unless the evidence shows that the witness is available to testify on behalf of the party, that the testimony of the witness would be relevant and noncumulative, and that the witness is not prejudiced against the nonproducing party. *Id.* Because the occasion for drawing such an inference arises when both parties have failed to call a material witness, if the jury is to attribute negative consequences to only one party's failure to do so, it must determine which of the parties is likely to be withholding damaging testimony. Thus, the jury may draw an inference adverse to a party toward whom the missing witness is "favorably disposed," because the party would normally be expected to produce such a witness, *see United States v. Johnson, supra,* 467 F.2d at 809; *United States v. Wright, supra,* 573 F.2d at 684. In addition, the jury may draw an adverse inference when a party fails to produce a material witness who is peculiarly available to that party. *United States v. Davila Williams, supra, United States v. Diaz, supra. See* 2 C. Wright, Federal Practice & Procedure, Criminal § 489 (1969). As *Johnson* makes clear, a party's ability to produce a witness is often dependent on the witness's predisposition toward that party. However, when a party having *exclusive* control over a witness who could provide relevant, noncumulative testimony fails to produce the witness, it is permissible to draw an adverse inference from that party's failure to do so,

even in the absence of any showing of the witness's predisposition toward the party. *See United States v. Johnson,* 562 F.2d 515, 517 (8th Cir. 1977). Typically, what is referred to as "an absent witness" or "missing witness" instruction deals only with "control," not with "predisposition." *See, e. g.,* E. Devitt & C. Blackmar, Federal Jury Practice and Instructions § 17.19 (3d ed. 1977);[20] Federal Criminal Jury Instructions of the Seventh Circuit § 3.25 (1980).

■ Although defendants orally requested a "missing witness instruction" several times during the trial, they did not, either orally or in writing, set forth the language of their proposed instruction.[21] Throughout the discussions concerning their request, defendants repeatedly argued that the informant remained in the government's control, and that because of the prosecution's meager efforts to produce him, the district court should find that Larain was less available to the defense than to the government. Defendants never argued that the jurors should be instructed that they may draw an inference adverse to the government from the fact that, as a former informant, Larain was likely to be favorably disposed toward the prosecution,[22] perhaps because doing so would have undermined their contention that the government's failure to produce him resulted in prejudice to the defense. *See* part III, *supra.* In light of the dominant connotation of "missing witness" instructions as referring only to a party's failure to call a material witness in its control, and the de-

---

**20.** § 17.19. ABSENCE OF WITNESS

If it is peculiarly within the power of either the prosecution or the defense to produce a witness who could give material testimony on an issue in the case, failure to call that witness may give rise to an inference that his testimony would be unfavorable to that party. However, no such conclusion should be drawn by you with regard to a witness who is equally available to both parties, or where the witness's testimony would be merely cumulative.

The jury will always bear in mind that the law never imposes on a defendant in a criminal case the burden or duty of calling any witnesses or producing any evidence.

**21.** The defendants did file a request for additional instructions setting forth specific language on reasonable doubt.

**22.** In their closings, defendants repeatedly argued, without objection by the government or instruction by the court, that the jury should draw a negative inference from the government's failure to call Larain as its witness. That they did so materially undercuts appellants' argument that the denial of a missing witness instruction deprived them of an inference favorable to the defense.

fendants' failure to make a specific request for an instruction or a finding concerning the disposition of the witness, we conclude that no request for an instruction *concerning the predisposition of the missing witness* was made to the district court. Therefore, the question whether the district court should have given a missing witness instruction turns solely on whether Larain was in the government's control.

We conclude that he was not. On the last day of the trial, during their argument for a missing witness instruction, defense counsel emphasized the ease with which they had been able to obtain information concerning Larain's whereabouts during the visit to the Don Pepe on the preceding evening. *See* pp. 9, 10, *supra.* In light of our discussion above and the absence of evidence that anyone connected with the prosecution either knew where to find Larain or had attempted to interfere with defendants' ability to obtain his testimony, we conclude that the district court did not err either in concluding that Larain was equally available to both parties or in failing to give a missing witness instruction.

*Affirmed.*

BOWNES, Circuit Judge (dissenting).

The majority opinion ably and fully sets forth the facts and pertinent cases. But I cannot accept its result. As a court, we must at all times preserve the integrity of our legal system. We cannot sanction or appear to condone deceitful and improper conduct by the Government.

A fair reading of the majority opinion can lead to but one conclusion: the Government behaved egregiously. The facts make it clear that the Government could easily have complied with its commitment to the magistrate that it "will inform the defendants, by not later than November 29, 1979, [of] the present status of its informant." Not only did it blithely ignore its agreement, worse still, it withheld relevant information. Some months before the *Petroz-*

*ziello* hearing, Agent Siebert had a chance encounter at the Holiday Inn with Larain, who told him that he had had a nightly show at the hotel and was still working there. Such information could obviously have facilitated the search for Larain, but the government agent dissimulated and did not reveal the full extent of his knowledge at the *Petrozziello* hearing. This was not the only instance of the Government's breaching an obligation it made to the court. At the conclusion of the *Petrozziello* hearing, the prosecutor promised that his agent "would continue to find out where [Larain] is." Five days after this representation, Agent Jorge testified that no one had told him to find Larain or even try to do so. Moreover, as the record indicates, the Government made but one telephone call to the informant's apartment—hardly an assiduous effort to secure information as to his whereabouts.

In *Davila Williams,* as the majority notes, we stated that "[i]t would be serious misconduct for the government intentionally to withhold or falsify the *Roviaro* information." *United States v. Davila Williams,* 496 F.2d 378, 382 (1st Cir. 1974). In my view, the tactics of the Government here constitute "serious misconduct." While this court has not yet determined precisely how far the Government "must go to keep track of, or search for, an informer," *id.* at 382, at a minimum the prosecution's duty requires that it "produce correct information or at least have exercised diligence reasonable under the circumstances to locate the informer." *Id.* The Government, as the majority concedes, did not satisfy the mandate of *Roviaro*; it did not furnish accurate and complete information to the defendant and failed to comply promptly with defendant's request regarding the informant's whereabouts.

The majority states that it would be compelled to reverse the convictions were it convinced that appellants had suffered prejudice.[1] My colleagues, in effect, balance

---

1. My brethren fault the defense for failing to show how Larain's testimony would have been helpful to defendants. It is not clear to me how

the defense could have made such a showing when they were deprived of the opportunity to interview the informant. The majority specu-

two factors—governmental misconduct and defense counsel's failure to show prejudice—and give greater weight to the latter. This shifting of the focus from the Government's misconduct to the tactics of defense counsel puts us in the position of condoning the Government's actions. I assume that the majority would agree that at some point governmental misconduct cannot be tolerated or excused regardless of the actions of the defendant. Drawing the line is, of course, an arguable matter. I believe that the Government, which represents us all, should strive to be beyond reproach in the conduct of a prosecution; to expect less damages the sinews of our legal structure. For me, the issue is not whether defense counsel failed to show prejudice; the critical question is how the Government acted. The agents of government are repositories of the public trust and must be worthy of it. They should conform to a rigorous standard of probity. Nearly a half-century ago, the Supreme Court examined the duties of the government prosecutor and declared:

> The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor—indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring a just one.

*Berger v. United States*, 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314 (1935). Those words still ring true and should apply to all those engaged in government service. I believe that the Government's conduct was so improper as to require that we dismiss the indictment in the exercise of our supervisory powers, *see United States v. DeJesus Boria*, 518 F.2d 368, 373 (1st Cir. 1975).

ON MOTION FOR REHEARING

In their petition for rehearing, appellants contend that the Court misread *United States v. Davila Williams*, 496 F.2d 378 (1st Cir. 1974), and *United States v. DeJesus Boria*, 518 F.2d 368 (1st Cir. 1975), by declining to reverse defendants' convictions in the absence of any prejudice resulting from the government's misconduct before and during the second trial. Contrary to appellants' assertion that the examination of prejudice conducted in *DeJesus Boria* occurred simply because the governmental misconduct was committed before our opinion in *Davila Williams*, in *DeJesus Boria* the Court turned to the question whether "the Government's conduct was such as to deprive defendant of a fair trial or else was so reprehensible as to require setting aside the exercise of its supervisory powers," after expressing its unwillingness "to say that in every instance of pre-trial disappearance even with government assistance, the Government must forfeit a conviction." 518 F.2d at 373. *See also United States v. Houghton*, 554 F.2d 1219, 1223 (1st Cir.), *cert. denied*, 434 U.S. 851, 98 S.Ct. 164, 54 L.Ed.2d 120 (1977), in which the Court addressed "the question of whether there was such deliberate misconduct by the government and prejudice to the defendant as to warrant dismissal of the indictment."

Moreover, appellants' assertion that the government's misconduct precluded them from interviewing Larain and establishing that they were prejudiced by his absence

---

lates that the defense was not seriously interested in searching for Larain, but rather sought grounds for reversible error. Speculation is an uncertain enterprise, and for that reason I think it unwise to make too much of it. Defense counsel's behavior, however, could be interpreted differently. My colleagues may pre-

sume too much about defense counsel's cunning. The failure of the defense to present, either orally or in writing, the language of their proposed "missing witness" instruction and to object to the omission of it from the court's charge hardly suggests astuteness or skillful tactics.

misconstrues both the facts and the concept of prejudice articulated in the Court's opinion. In light of "(a)ppellants' complete failure to take any actions consistent with a sincere interest in obtaining the informant's testimony," at 12, the Court concluded that appellants had not established "that the informant *was* unavailable at the time of the second trial." *Id.,* at 15 (emphasis in original). Thus, appellants failed to establish prejudice because they failed to show Larain's unavailability to testify at the second trial.

*The petition for rehearing is denied.*