**UNITED STATES of America,**
**Appellee,**

v.

**Nicolas DeJESUS BORIA,**
**Defendant-Appellant.**

**No. 74–1134.**

United States Court of Appeals,
First Circuit.

Argued Feb. 6, 1975.

Decided June 13, 1975.

John L. A. De Passalacqua, Rio Piedras, P. R., by appointment of the court, for defendant-appellant.

Jorge Rios Torres, Asst. U. S. Atty., with whom Julius Morales Sanchez, U. S. Atty., San Juan, P. R., was on brief, for appellee.

Before COFFIN, Chief Judge, McENTEE and CAMPBELL, Circuit Judges.

LEVIN H. CAMPBELL, Circuit Judge.

Appellant was convicted in a jury-waived trial on four counts of an indictment charging him with, on two occasions, possessing with intent to distribute and distributing heroin, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A). He contends on appeal that the court erred in denying his motion to require the recording of Spanish language testimony in Spanish rather than in English translation only, and in denying his motion to require the Government to produce its informer for possible use as an adverse witness.

The Government's principal witness was Hector Cubille, a Puerto Rico policeman working with the Federal Bureau of Narcotics and Dangerous Drugs. There was also testimony from federal agent Amador Fortier, who supervised the investigation and undercover operations, and from a chemist who identified two packages as containing heroin. No evidence was presented on behalf of appellant.

Cubille testified that an informer, Rafael Soriano Baez, phoned federal authorities to say that he had arranged to buy an ounce of heroin from appellant. On April 4, 1973, Cubille drove with the informer to appellant's residence. The informer introduced Cubille to appellant as the friend who wanted to buy the ounce of heroin. Cubille asked if the heroin was good, and appellant replied that it was of the best. Cubille asked

about the price, appellant said $1400, Cubille replied it was too much, and a price of $1300 was agreed upon. Cubille asked for the material. Appellant said to wait for a while, got his slippers and shirt from the house, and went across the street and out of sight for about 20 minutes. When appellant returned, Cubille asked if he had the heroin, and appellant said yes. Cubille and the informer went to the car and got $1300 from the trunk and went back to appellant. Cubille handed appellant $1200. When appellant counted the money and noticed that $100 was missing, Cubille gave him another $100. In exchange, appellant gave Cubille a package wrapped in tin foil and containing white powder. Cubille and the informer delivered the package to federal agents, and a field test showed it to contain heroin.

Cubille testified as to a second transaction, also arranged by the same informer, with a codefendant, Wilfredo Tapia Rodriguez. Cubille and the informer went to appellant's residence on April 7, 1973, to discuss the purchase of one-eighth kilogram of heroin. They talked to appellant about the price, but when Tapia did not arrive they told appellant they would return later. They returned at 6:30 p. m. and Tapia arrived in a yellow Camaro at 7 p. m. The informer tried to talk with Tapia, and Tapia told him to wait for a while and went inside appellant's residence. Several minutes later Tapia came out and greeted the informer, who introduced Cubille as the person they had discussed who wanted the eighth of a kilogram of heroin. Cubille told Tapia that appellant had asked for $6000, but that he had only $5000. Tapia said to wait, he would settle the matter. Tapia went inside, came out several minutes later, and said the price was settled at $5000. Tapia went back inside, and appellant came out and told Cubille and the informer to go inside. In the presence of Tapia and the informer, Cubille gave appellant $5000 and in exchange received a package containing a white powder. The package was later turned over to agent Amador.

According to testimony from Cubille and Amador, the informer and his car were searched by agents for drugs on each occasion that Cubille and the informer departed for or returned from appellant's residence. The informer was not kept under surveillance except during the two transactions; he was not under surveillance at the time he said he contacted appellant and Tapia to arrange the sales.

Amador testified that he observed appellant leave his house and disappear into the neighborhood before making the sale to Cubille on the night of April 4. On cross-examination, Amador stated that he knew the informer had previously either sold or used drugs, and that he had become an informer for the local police and then the federal agents after an arrest by the local narcotics officers. An officer in the narcotics division of the local police told Amador that the charges against the informer had been dropped. Amador further testified that the informer's pay, except for subsistence money, depended on sales he could arrange.

We first consider if the court erred in not requiring Spanish testimony to be recorded in Spanish. Under present law, proceedings in the District Court for the District of Puerto Rico are conducted in English, 48 U.S.C. § 864. When a witness testifies in Spanish, questions and answers are channeled through an interpreter, and it is the interpreter's English translation that appears in the record. *Bordas & Co.* v. *Pizarro,* 314 F.2d 291, 292 (1st Cir. 1963). When a witness testifies in English, an interpreter is provided on request to translate to a Spanish-speaking defendant.

Appellant's counsel would like all persons in the courtroom to be provided with three-channel hearing devices carrying (1) the actual voices of those speaking in the proceeding, whether in English or Spanish; (2) an all-English version, including a translation of words spoken in Spanish; and (3) an all-Spanish version, including a translation of words spoken in English. Both the orig-

inal and translated versions would be transcribed and preserved as a part of the record, rather than only the English version.

 Whatever its advantages, the proposed system would require additional court personnel and cost; and, since we do not believe the present system is unconstitutional, we must leave it to Congress whether to adopt the changes appellant urges. We are of the opinion that the present system affords Spanish-speaking defendants their rights to due process, a fair trial, the assistance of counsel, and the equal protection of the laws under the fifth, sixth, and fourteenth amendments. In the present case, we find nothing specific to indicate that appellant was affected by linguistic or translation errors, or indeed that there were material uncorrected errors. English testimony and court proceedings were translated into Spanish for his benefit,[1] and his able bilingual counsel and the court[2] could hear the translations being made into and from Spanish. Alleged inaccuracies could be and in several instances were called to the interpreter's attention. There was no error.

Appellant's second claim is that the Government should have been required to produce the informer, Soriano Baez. Before trial, in response to a motion for a bill of particulars, the United States Attorney's office gave appellant's counsel the name and "last known address" of the informer, in purported compliance with the requirements set forth in *Roviaro* v. *United States,* 353 U.S. 53, 65 n.15, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957). The informer was not at the address, and in searching for him appellant heard rumors (which he passed on to the United States Attorney's office) that the informer was in Spain, Carolina, or Aquadilla. Appellant then requested that the Government be required to produce the informer for questioning and possible use as a witness, but the district court de-

nied the motion. At no time did appellant seek to subpoena the informer. During trial, at the end of the Government's evidence, appellant once more moved for the production of the informer for possible use in an entrapment defense. Appellant argued that the Government probably knew where the informer was located, since he had been its agent and allegedly still had local drug charges pending against him. The Assistant United States Attorney in charge of the case continued to deny any knowledge of the informer's whereabouts, taking the position that the Government was under no duty to find him. The court denied appellant's motion. The court also denied appellant's motion under 18 U.S.C. § 3006A(e)(1) for the appointment of an investigator to determine the location of the informer, on the grounds that the motion was belated and that there was no showing that the informer's appearance would benefit appellant.

Appellant was tried and convicted in December, 1973, and Tapia was tried separately in February, 1974. At Tapia's trial it was revealed during the cross-examination of Agent Amador that sometime in May, 1973 (a month after the heroin transactions and the same month the indictments were filed), Amador drove the informer to the airport, and the informer said he was flying to Spain. Amador said he had no further knowledge of the informer's whereabouts. Appellant's counsel learned of Amador's testimony on the day appellant was sentenced, and promptly renewed his motion for the production of the informer. The motion was denied. The court, upon being told by the Assistant United States Attorney that he did not know the informer's address in Spain, stated that the Government had complied with the requirement of giving the informer's last known address.

 At least two issues are presented on these facts. First is the conduct

---

1. Of the Government's three witnesses, Cubille testified in Spanish, and Amador and the chemist testified in English.

2. The judges sitting regularly in the District Court for the District of Puerto Rico are bilingual, as was the judge in this case.

of the Assistant United States Attorney in charge of this case, who throughout the proceedings made no mention of the flight to Spain. Moreover, when the facts were finally revealed, he was less than accurate in his version of what had occurred in another courtroom.[3] It is possible that Agent Amador had not revealed to the Assistant United States Attorney that the informer had been driven to an aircraft bound for Spain. Even if he knew, the Assistant United States Attorney may have been concerned about protecting the informer, who, we might infer, was allowed to go abroad in return for his assistance in this and other cases. But if the prosecutor knew of the departure, a studied failure to reveal it would come close to deliberate misrepresentation. Furnishing the informer's "last known address" implied that the Government was furnishing its most current information about the informer's whereabouts. While appellant apparently lost little time in discovering that the address was useless, the Government should have confirmed the reports that the informer had left Puerto Rico. We do not at all agree with the district court that the Government's disclosure was adequate. On the other hand, the withholding was not so prejudicial as by itself to warrant reversal. The Government has not ceased to maintain that it does not know the informer's whereabouts, whether in Spain or elsewhere. There is no reason to believe that if the trip to the airport had been earlier revealed, the informer's presence could have been secured.

■ A second issue, going beyond concealment of the informer's trip abroad, concerns the Government's cooperation in his departure. Agent Amador at Tapia's trial testified that he thought the informer paid for his own air ticket, but as he was allowed to leave and was escorted to the airport, it seems obvious that his leaving was officially sanctioned and perhaps even required official sanction in view of the informer's criminal involvement. This court, in a decision rendered after the instant case was tried, said,

"[T]he government's duty under *Roviaro* to produce names and addresses requires it to produce correct information or at least to have exercised diligence reasonable under the circumstances to locate the informer. It would be serious misconduct for the government intentionally to withhold or to falsify the *Roviaro* information. How far it must go to keep track of, or search for, an informer is less easily stated; that depends on many factors including the extent of the government's control over the witness, the importance of the witness' testimony, the difficulty in finding him, and similar matters. We do not accept a flat rule requiring production of all informer witnesses whenever the government has not disclosed their names before trial. . . . But should an informer disappear or become unavailable to the defense, we would compel the government, upon timely demand, either to locate him or make an affirmative showing satisfactory to the court why it could not reasonably be expected to do so and of its diligence generally as regards the disappearance."

---

3. "THE COURT: Do you know his [informer's] address in Spain?

MR. PASSALAQUA [appellant's counsel]: I think the United States Attorney could give us that information.

MR. QUILES [Assistant United States Attorney]: I am required to inform the last known address, and that's what I informed counsel. In the case of Tapia Rodriguez it came out that Mr. Amador Fortier had known that defendant at least ten years or more, and he was asked about the informer

and he says he saw the informer at the airport leaving for Europe—he didn't say Spain. It does not mean he was going to be in Spain. That's all that transpired and the record is clear.

THE COURT: I believe you complied with the requirement of giving his last known address. Anything else?

MR. PASSALAQUA: No, Your Honor."

The record in *Tapia* v. *United States,* No. 74–1135 (1st Cir. June 13, 1975), shows that Amador said he took the informer to the airport, and the informer said he was going to Spain.

*United States* v. *Davila Williams,* 496 F.2d 378, 382 (1st Cir. 1974). In *Williams* we made it clear that the bare furnishing of a name and a non-usable address might not suffice if, with reasonable diligence, the Government could locate the informer. Thus the Government's flat refusal even to consider doing more in the present case did not meet *Williams'* standards. However, this case preceded *Williams,* and the question is not whether there was literal compliance. The Government has steadfastly maintained ignorance of the informer's whereabouts, and the record does not lead us to assume that it possessed capacity to produce the informer at trial.

The harder question is whether, having assisted the informer in flight to another country, the Government can take refuge in its later inability to locate him. Is its conduct consistent with the diligence required in *Williams?* It would be unthinkable for a court to sanction government removal of a witness for the purpose of denying his testimony to the defense. On the other hand, an informer may be in danger of his life, or may have exacted the Government's promise to assist with his flight to another jurisdiction in return for his cooperation. We are unwilling to say that in every instance of pre-trial disappearance even with government assistance, the Government must forfeit a conviction. So long as informers play a role in law enforcement, courts must face the uneasy task of ruling on claims of foul in a game which is virtually devoid of ethics. In each instance the court must weigh the circumstances and satisfy itself whether the Government's conduct was such as to deprive defendant of a fair trial or else was so reprehensible as to require setting aside his conviction in the exercise of its supervisory powers.

Here we do not believe that the Government's complicity so tainted the informer's absence from the trial as to compel reversal. The informer's role was limited to setting up the transactions, and while appellant argues that he may have an entrapment defense, there is no evidence of entrapment in this record.[4]

The Government's participation in the informer's departure might suggest a purpose not to have him available at the trial; but there are other explanations at least as likely—the informer's safety, or a prior deal extending permission to leave the country in return for services.[5] In the absence of any persuasive indication that the informer's testimony would be exculpatory or helpful to appellant, the Government's conduct does not lead us to infer a deliberate attempt to deprive appellant of useful evidence. Appellant never subpoenaed the informer, and he requested an investigator to help locate the informer only at the very end of the trial. We do not find either that the Government's conduct was so reprehensible as to necessitate reversal in our supervisory capacity or that there was such prejudice to appellant as might otherwise require reversal.

Affirmed.

---

**4.** Appellant's post-conviction testimony in Tapia Rodriguez's trial—claiming that the informer gave appellant the heroin to prepare and sell to Cubille in return for most of the selling price—is not evidence in this case. Even if it were, appellant, who has been previously convicted for selling drugs, would have to persuade the factfinder of inducement. And if the factfinder nevertheless found predisposition, a successful entrapment defense would still be problematic. *United States* v. *Jett,* 491 F.2d 1078, 1080–81 (1st Cir. 1974); *see United States* v. *Russell,* 411 U.S. 423, 433–36, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973).

**5.** Agent Amador testified that the informer had worked for the Federal Bureau of Narcotics since March, 1973, and previously had worked for the narcotics division of the local police. Amador stated that the informer had sometimes spent "a lot of time" making connections with drug traffickers.