COMMONWEALTH vs. JOSEPH CURCIO
(and three companion cases).[1]

No. 87-1340.

Suffolk. September 9, 1988. — January 9, 1989.

Present: DREBEN, KAPLAN, & FINE, JJ.

*Controlled Substances. Entrapment. Search and Seizure,* Warrant, Exigent circumstances. *Evidence,* Informer. *Practice, Criminal,* Access to witness, Conduct of prosecutor.

Exigent circumstances supported the actions of police in accompanying their informer into a house in which he was about to consummate a large drug purchase with possibly armed suspects, and evidence seized in the house at that time without a warrant was admissible at the suspects' criminal trial. [745-746]

The conclusion of a judge at a criminal trial that the Commonwealth did not "control" a certain named informer so as to render him unavailable as a witness for the defendants at trial was supported by the record [746-748]; and, in any event, the defendants demonstrated no prejudice to their defense from the absence of the witness [748-749].

In a criminal case, the defendants' motion to dismiss the indictments on the ground of prosecutorial misconduct for failing to disclose an informer was properly denied where the defendants knew the informant's identity and role in the activities which occasioned the indictments. [749]

INDICTMENTS found and returned in the Superior Court Department on December 9, 1985.

A pretrial motion to suppress evidence was heard by *James D. McDaniel, Jr.,* J. Other pretrial motions were heard by *Elizabeth J. Dolan,* J., and the cases were tried before her.

*John C. McBride* for the defendants.

*Susan Underwood,* Assistant District Attorney, for the Commonwealth.

---

[1] Two of the companion cases are against Joseph Curcio and one is against Sheron Curcio.

KAPLAN, J. Joseph Curcio and his wife Sheron were each indicted for trafficking on two occasions, on November 12 and 17, 1985, in cocaine of a weight over 28 grams, and for trafficking on a third occasion, on December 1, 1985, in cocaine of a weight over 200 grams. At joint trial, a Suffolk County jury found Joseph Curcio guilty of the crimes charged in the indictments against him. They acquitted Sheron of the crime charged to her on November 17, and found her guilty of possession with intent to distribute over 200 grams of cocaine, a "lesser" crime "included" in the charge of trafficking on December 1, 1985. (At the close of the Commonwealth's case, the trial judge had allowed Sheron's motion for a required finding of not guilty of the crime charged to her on November 12, 1985.) The defendants appeal from the judgments of conviction.[2]

We set out the criminal acts and the defendants' attempted response by a claim of entrapment. Then we consider an early pretrial motion to suppress evidence, and motions just before trial to secure access to an informer and to dismiss the indictments for prosecutorial misconduct. We hold that the case was well proved, and the motions correctly denied.

1. *The case.* For the basic facts, one turns largely to the testimony at trial of Trooper Michael Grassia, working undercover, and Trooper Andrew Palombo, the officer in charge who, with other officers, provided continual surveillance. (Much of the story was also told upon the motion to suppress evidence.)

Police investigation in October, 1985, evidently pointed to the defendant Joseph Curcio as a middleman of cocaine distribution. One Richard Fothergill, an informer, renewed his boyhood acquaintance with Curcio and, in the role of a jeweler, introduced Curcio to "Michael Carradonna," ostensibly a jeweler, who was interested in obtaining cocaine for some

---

[2] Joseph Curcio was sentenced to ten to fifteen years' imprisonment at M.C.I., Cedar Junction, on the 200 grams indictment and, concurrently, to three to five year terms on the other indictments. Sheron was sentenced to three to five years at M.C.I., Framingham, suspended, with three years probation.

unnamed fellow jewelers. Carradonna was in fact Trooper Grassia.

On November 12, 1985, at 9:30 P.M., Fothergill, Curcio, and Grassia met at the lounge of the Logan Hilton Hotel in East Boston.[3] The meeting eventuated in Grassia's handing Curcio $2,000 in cash; Curcio left the lounge and returned around midnight and delivered an ounce of cocaine to Grassia. Curcio vouchsafed in conversation with Grassia that he had a "connection" in New Hampshire who processed fifty kilograms of cocaine monthly for distribution in that State and Massachusetts. Curcio could secure a kilogram for Grassia at a price between $44,000 and $46,000; and in such a transaction Curcio would just want to be taken care of with a kind of finder's fee. On a napkin (received in evidence) Curcio figured the economies Grassia might achieve by buying a kilo instead of just an ounce. Grassia expressed interest. Grassia provided Curcio with his buzzer number; Curcio had noted his home telephone number on the napkin.[4]

On November 14 Curcio inquired whether Grassia wanted more cocaine but was told no, perhaps there would be a call during the weekend. On November 17, a Sunday, Grassia got in touch with Curcio, who said Grassia was in luck, the connection, "Cliff," was in Waltham with a supply. Grassia and Curcio met at the Howard Johnson in Woburn at 12:30 P.M.; Grassia handed $2,000 to Curcio; Curcio left and returned by 2:00 P.M. with an ounce of cocaine.[5] Late on the same day, Curcio called to say he had taken an extra ounce from Cliff. Grassia said no to this offer, but indicated he wanted to talk

---

[3] Grassia brought with him and displayed a bag of miscellaneous jewelry pieces.

[4] During this meeting on November 12, Curcio mentioned familiarly two practical tests for the quality of cocaine: put a sample on your wrist, the cocaine proper will be absorbed, what remains is the substance with which the cocaine has been cut; put a sample on the side, not the front, of your tongue for the numbing sensation.

[5] Curcio observed a helicopter overhead and said he might have been followed. Grassia jokingly said he must be paranoid. In fact, Trooper Palombo was in the helicopter attempting to follow Curcio's movements.

about a large quantity. The next day, Grassia called Curcio at his workplace and said he now wanted a big package. At 6:00 P.M., at a meeting at the Logan Hilton lounge, a deal was set for a kilo at $45,000, with an additional $3,500 for Curcio. Grassia said he would call when he had assembled the money. In fact it was Curcio who called on November 20 to say he had placed the order but a new shipment was coming in that would require five days for processing.

At a meeting in the Logan Hilton on the evening of November 26, it appeared that the transaction would go through the following day. Curcio proposed that, as in the prior sales, the money be handed to him, with the connection close by to furnish the merchandise, which would then be passed to Grassia. Grassia had distinct reservations about this scenario, when he would lose control of so much money, but he did not comment. Curcio spoke of what would happen if the deal soured and the police caught anyone: the New Hampshire people were bad and would make sausages of the two of them. Curcio said he would not let himself be caught and jailed; he would have his wife sell their house and he would make bail and flee. At the time Curcio was working for the United Fruit Company. He spoke of bringing in Colombian cocaine with shipments of bananas.

Curcio arrived, dejected, at a meeting in room 331 of the Logan Hilton on November 27. He called his wife and was told Cliff had not called. He called Cliff's beeper and a call came in to say the deal was off for the night. Curcio complained of the delay: he had lots of bills to pay, and showed a slip representing a loan of $2,000 which was related to his loss on a one-ounce transaction.[6] Grassia had brought along the money for the "buy" and showed it to Curcio. On November 28, Curcio on the telephone assured Grassia the deal would "go down" on the thirtieth or December first.

On November 30 the two waited in room 442 from 7:00 P.M. onward for the call from the connection that would initiate the kilo transfer. Meanwhile Curcio counted the money in Grassia's

---

[6] It later appeared that the slip was not genuine.

briefcase: the process took an hour. After making a number of calls, without result, Curcio drew out a loaded .25 caliber German handgun and said it was insurance, should anyone interfere. As a gesture of good will toward Grassia, he took out the bullets and offered to flush them down the toilet. He had debts and was anxious for the deal. He would do anything to see it through: on his knees, he said he would "blow" Grassia if that would do it. Still there was no signal from the connection when the men parted at midnight.

At 6:30 P.M., December 1, a Sunday, Curcio joined Grassia in room 442 and said the kilo was in, it was at his house, and the connection was there. Curcio suggested that the transfer be made at the house, but Grassia demurred on grounds of safety and suggested a neutral place. However, the connection, when called by Curcio, stood firm: the house would have to be used and it must be soon, otherwise he would leave, he had other deliveries to make. Grassia yielded, and said he wanted to reconnoiter the area and would arrive in a little while.[7] In an interval after Curcio left, Grassia was able to make arrangements with Trooper Palombo so that the final events took place as follows. Grassia drove to Curcio's residence, 82 Undine Avenue, Winthrop, parked his car nearby, and entered the house, being met at the door by Curcio. Curcio's wife Sheron (the codefendant) was there with two young children. A man — the connection, named Clifford Guilfoyle — was in the living room. Curcio conducted Grassia to a back room and drew from an article of furniture two bags with white substance, evidently (and in fact) cocaine, which Grassia inspected briefly. Then Grassia left the house, went to his car, opened the trunk, and took out a briefcase. This activated the officers at hand. Grassia returned to the house carrying the briefcase. He was followed closely by the officers who invaded the house, arrested Curcio and Guilfoyle, and ostensibly arrested Grassia. Guilfoyle was carrying a loaded .380 caliber Beretta

---

[7] Palombo and other officers were in the room next to 442 (and earlier in a room adjacent to 331) and could overhear conversations. Grassia had been able to get advice from Palombo about suggesting a neutral spot and finally agreeing to go to Curcio's house.

automatic pistol.[8] Sheron was not arrested but was sent upstairs with the children. Grassia made known where the bags of cocaine were located, and these were seized. So also were two scales.[9] The cocaine was found to weigh approximately one kilogram and assayed at an average percentage in the high sixties of pure cocaine.

We consider what Curcio said in his testimony on his own behalf. His account of the one-ounce transactions and the final planned buy of a kilo varied only in details from Grassia's and Palombo's. He denied having a weapon on the night of November 30 but seemed to concede going down on his knees to have the kilo deal succeed. So Curcio could readily be found to have committed the acts denounced by the trafficking statutes.

Here is a summary of all of Curcio's testimony bearing on entrapment. He described himself as forty-two years old, a "computer facilities consultant" then employed by an investment company; divorced and remarried, he had two children of the first marriage and two of the present. He had no arrest record. He said he had had no involvement in narcotics until Fothergill turned up in the fall of 1985. Fothergill showed him miscellaneous jewelry; he was interested in buying some for the coming Christmas or a birthday and also in having some of his wife's pieces and his own repaired. His acquaintance with Fothergill became more intimate and he entrusted some items to him for repair. Fothergill asked whether Curcio could get him a small amount of cocaine, and Curcio obliged by going to his luncheon place at Park Square, Boston, where he had heard talk of cocaine, and procuring a gram for his friend. He did this three times. He did not seek reimbursement, but perhaps would count the cost against what he might owe Fothergill for purchases of jewelry or for repairs. Then Fothergill

---

[8] The police had previously ascertained that Guilfoyle had a New Hampshire (but apparently not a Massachusetts) firearms license and owned various weapons.

[9] One was a scale commonly used in weighing narcotics. (Curcio said Fothergill had suggested he buy it.)

said he wanted to introduce Curcio to his partner Mike Carradonna; evidently Mike was interested with other jewelers in having access to cocaine. The November 12 meeting followed. Curcio said he had heard about prices of cocaine from his acquaintance, Cliff, and so was able to make the calculations on the napkin.

Curcio said he acted under various pressures. There were many insistent telephone calls from Fothergill and some from Grassia about the drug procurement. He feared he would not get his jewelry back if he failed to deliver the cocaine. He said he had given three or four rings and two watches to Fothergill; between November 12 and 27 he had retrieved both watches and one ring. He said he was badly in need of money and was thus drawn into crime that offered a prospect of profit. Such facts as he presented about his debts, while not describing a situation of acute stringency, might picture a man, highly employable in his specialty, who (by his own account) was living up to his means and maybe somewhat beyond. His weekly salary in 1985 was around $700 or $750 against which he paid alimony of $430 monthly and had mortgage and other obligations seemingly not unusual for a person in his social and financial class. Finally Curcio testified that he apprehended the jewelers represented by Grassia might do him harm if, having once supplied them, he failed to go on delivering.[10] As he began to fall into a routine of furnishing the goods, he said he became anxious and nervous and started taking valium from his wife's prescription.

We may pretermit the question whether there was enough evidence of entrapment even to warrant a jury instruction, see *Commonwealth* v. *Miller*, 361 Mass. 644, 651-652 (1972); *Commonwealth* v. *Thompson*, 382 Mass. 379, 384-385 (1981); *Commonwealth* v. *LaBonte*, 25 Mass. App. Ct. 190, 194 (1987), for the judge did in fact instruct; but the Commonwealth established the negative overwhelmingly. Far from being a naif, enticed by others against his will into the cocaine traffic,

---

[10] Curcio said Grassia had reported threats from a jeweler "Franco" (actually an invention of Grassia's). But by this time Curcio had involved himself in acting as supplier.

Curcio could justly be found knowledgeable and proficient in the business, with assured access as a middleman, and ardently eager to promote profitable transactions. Indeed, if one ignores the evidence indicating that Curcio was already "predisposed" at the time he was approached by Fothergill and Grassia, and one accepts what Curcio said about himself, entrapment is still nowhere in the picture. See *Commonwealth* v. *Shuman*, 391 Mass. 345, 352 (1984). If insistent telephone calls, the possible risk of losing some jewelry, and a need for money no more grievous than that felt by many other citizens, sum up as entrapment that excuses guilt for violation of the drug laws, then those and other laws would be in some danger of practical repeal. Curcio was the "unwary criminal," not the "unwary innocent," see *Sherman* v. *United States*, 356 U.S. 369, 372 (1958), and Grassia was close to the mark in saying that Curcio was moved by simple greed.[11]

2. *Motion to suppress.* In the short time between Curcio's leaving the hotel on December 1 and Grassia's arrival at Curcio's house, Trooper Palombo tried to get permission for the impending search. He telephoned Joseph Fiandaca, assistant clerk-magistrate of the East Boston District Court, and described the situation to him. Fiandaca told Palombo to go ahead; documentation could follow when time permitted. It is agreed that such an "oral warrant" was not valid, and the search and seizure must be considered warrantless. As noted above, much of the substance of the case was testified to in lengthy hearings on the defendants' motion to suppress. The motion was denied with detailed findings.[12]

Whether the course of events up to December 1 provided probable cause for the entry and seizure need not be discussed,

---

[11] We have not made separate mention of the case against Sheron. She knew her husband's dealings in cocaine and assisted in communications regarding them. The jury were circumspect in finding her complicit in and guilty of only the lesser offense in connection with the (aborted) sale of the kilo of cocaine at the Winthrop house.

[12] The hearings and findings also dealt with Guilfoyle's motion to suppress materials taken from his car as well as from the house. The case against Guilfoyle need not concern us.

for cause was surely present at the stage of Grassia's giving his signal by opening the trunk of his car. Were the circumstances exigent? The judge correctly answered yes. Because of the connection's unexpected final insistence on consummating the deal at Curcio's house, there was insufficient time to obtain a proper warrant. See *Commonwealth* v. *Amaral,* 16 Mass. App. Ct. 230, 234 (1983). Contrast *Commonwealth* v. *Forde,* 367 Mass. 798, 802 (1972). For Grassia to reenter the house without immediate reinforcements would involve serious danger: Curcio had displayed a gun and warned of New Hampshire bad men and Guilfoyle was known to possess firearms. See *Forde* at 807; *Commonwealth* v. *DiSanto,* 8 Mass. App. Ct. 694, 700 (1979). To hold Grassia back, perhaps awaiting a warrant, would have been improvident: Curcio and Guilfoyle would know the police were about and might dispose of the important evidence, or decide to break from the house, or to summon their own reinforcements. See *Commonwealth* v. *Huffman,* 385 Mass. 122, 126 (1982). In any view of the matter, there was an exigency to which the police responded reasonably, as the judge found. See *Amaral* at 233; *Commonwealth* v. *Young,* 382 Mass. 448, 456 (1981).

3. *Motion to reach informer.* While this motion is referred to at various places as a motion for the disclosure of the identity of the informer, it was in effect a motion to secure access to the informer so that the defense might talk to him and possibly avail itself of his testimony. The defendants in fact knew not only the informer's identity but also his personal history and his usual residence in Winthrop; but they could not find him and serve him with a subpoena. The motion directed to the production of Fothergill was heard by the trial judge just before trial; it was renewed during trial; and the judge made findings shortly after the close of trial. The judge denied the motion as such, but, before the trial commenced, she ordered the Commonwealth to "release any and all information concerning the present or last known residence or other location" where Fothergill might be found and served with process.[13] The information

---

[13] A like motion had been made and denied at the earlier hearings on the motion to suppress evidence. At that time the defendants supposed that Foth-

released consisted of the last known address, which was the Winthrop address.

With the informer's identity known, the Commonwealth could not claim the "informer's privilege" of barring testimony by him. See *Commonwealth* v. *Congdon*, 265 Mass. 166, 175 (1928); *Pihl* v. *Morris*, 319 Mass. 577, 579 (1946); Liacos, Handbook of Massachusetts Evidence 191-192 (5th ed. 1981). The Commonwealth, neither by itself nor by connivance with the informer, was to put any obstruction between the defense and the informer, and it must offer the defense whatever information it had about the informer's location. "As we observed in *United States* v. *Williams*, 496 F.2d 378 (1st Cir. 1974), the government's duty with respect to production of an informant, as distinguished from its duty to merely name the informant, is not easily stated. However, we noted in *Williams* that this duty is dependent on several factors, among them the extent of the government's control of the witness, the importance of the witness' testimony, and the difficulty in finding the witness. Moreover, we indicated that the government would not be held at fault for failure to produce an informant where it could affirmatively show to the court's satisfaction that the production of the informant could not be expected and that its conduct has been diligent." *United States* v. *Diaz*, 535 F.2d 130, 134 (1st Cir. 1976). Cf. *Commonwealth* v. *Balliro*, 349 Mass. 505, 516-518 (1965). After hearing, the judge here found there was "insufficient evidence . . . that the State police had the degree of control so as to render Fothergill unavailable for service of process" after the arrests of December 1, 1985 (and the closing of this case with Fothergill by a payment to him of $1,500 on December 3 or 4, 1985). Besides two or possibly three meetings, there were as many as a hundred communications, extraneous to the present case, between Palombo and Fothergill in the subsequent year 1986, but these were by telephone and it is not indicated that Fothergill disclosed his location. At one point Fothergill mentioned to

---

ergill might testify that Curcio and Guilfoyle were not fearsome people and so, forsooth, there was no exigency justifying a warrantless search.

Palombo that he was willing to testify, but it is not indicated that he would volunteer to talk to or testify for the defense. Although an inference or implication of control might possibly have been made by a different trier, we are not in a position to reverse the judge's negative finding herein.

Were control found, the weight of the other factors would still have to be considered, notably the importance to the defense of the witness's testimony. To go further, were it even held that the Commonwealth was delinquent in its duty to assist in the location of the witness, the defense could make no progress without a showing of material prejudice. See *United States* v. *DeJesus Boria*, 518 F.2d, 368, 372 (1st Cir. 1975); *United States* v. *Houghton*, 554 F.2d 1219, 1223 (1st Cir.), cert. denied, 434 U.S. 851 (1977); *United States* v. *Ariza-Ibarra*, 651 F.2d 2, 12 (1st Cir.), cert. denied, 454 U.S. 895 (1981). See also *United States* v. *Giry*, 818 F.2d 120, 130 (1st Cir.), cert. denied, 484 U.S. 855 (1987). If, indeed, we had here a prospective witness whose testimony could not be foretold and might be consequential, then (assuming control) the witness should be produced without speculation about just what he might say. Cf. *Balliro*, 349 Mass. at 516-517; *Commonwealth* v. *Ennis*, 1 Mass. App. Ct. 499, 504 (1973). The present situation is quite different. Testimony by Fothergill could possibly bear on the actual drug transactions[14] and the claim of entrapment. On the first point, we have seen that Curcio's own testimony did not challenge materially, rather it confirmed, the detailed account of the transactions given by the officers. On the second point, again we have Curcio's own testimony: as the judge perceived, it left no room at all for supposing Curcio to be the victim of entrapment by Fothergill or any one else. So far from there having been any prejudice

---

[14] That Fothergill was present at the actual exchanges was suggested in spotty testimony on the point by Curcio. The judge found this testimony incredible. Instead the judge believed the Commonwealth's evidence that Fothergill had been instructed "not to be present when drug deals were discussed and transactions made" and that the instruction was carried out. The point is not important in view of Curcio's lack of challenge to the proof of his own participation in the deals.

to the defense through Fothergill's absence, the entire motion gave off the scent of the herring, an attempt to distract attention from the defendants' manifest guilt.[15]

4. *Motion to dismiss for prosecutorial misconduct*. This motion, too, was heard and denied just before trial, was renewed in the course of trial, and was finally disposed of with memorandum after trial.[16] There was testimony by the assistant district attorney who acted as trial counsel. She said she knew an informer was in the case early on, but did not know his identity until perhaps the end of November, 1985. She had given an instruction that the informer was so to conduct himself as to avoid being a percipient witness of the actual drug deals, and she assumed the instruction was carried out (see note 14). When asked by defense counsel after the indictments whether there had been an informer in the case, she was evasive, and on a few occasions indicated that there was none. This was on her view that this particular person, remaining apart from the criminal transactions themselves, was not in the legal sense an informer. However, at the suppression hearings, with the informer's identity known, she sought to exclude evidence bearing on his activities, claiming privilege. The judge rebuked the prosecutor for lack of candor in her answers to defense counsel. The judge apparently accepted that the prosecutor was confused in her conceptions about informers, but did not find her intentionally deceptive. We agree with the judge's strictures. The defendants, however, knowing the informer's name and place in the story, can hardly show they were hurt by the prosecutor's behavior. See *Commonwealth* v. *King*, 400 Mass. 283, 290 (1987). This is not the sort of case in which a prosecutor's conduct is so offensive that for the sake of dramatic example a judgment of conviction should be peremptorily overthrown. See *Commonwealth* v. *Manning*, 373 Mass. 438, 443 (1977).

*Judgments affirmed.*

[15] The defense in its presentation to the jury pointed repeatedly to the absence of Fothergill but the jury were unmoved.

[16] It was also made and denied during the hearings on the motion to suppress.