Agnes, A.J.
The defendant and co-defendant are charged by indictment with Trafficking in Cocaine in excess of 100 grams. The prosecution arises out of events that took place on June 15, 1999. The police investigation resulted in the search of both a first-floor apartment and a second-floor apartment located at 119 Garden Street in Lawrence. By agreement of the parties, the defendant does not challenge the search of the first floor apartment of 119 Garden Street because he agrees that he lacks standing to do so. Instead, the focus of this motion to suppress is on the search of the second-floor area where drugs and other evidence were seized without a warrant.
FINDINGS OF FACT
Based on the credible evidence presented at the defendant’s motion to suppress and the reasonable inferences that may be drawn from the evidence, I make the following findings and rulings.
Special Agent James Doyle has been an agent of the Drug Enforcement Administration of the United States Department of Justice for 14 years. Between 1997 and 1999, he served as a member of the Cross Border Initiative operated by the Boston Field Office. He became involved in an investigation of Henry Robles, aka Henry Ibar, aka Henry Trinidad, a co-defendant in this case who is also known by several other names. The investigation centered on 119 Garden Street. On June 15th, a controlled buy was arranged. At approximately 1:45 p.m., Agent Doyle, who was acting as the case agent or officer-in-charge, and numerous other officers met with a confidential source (Cl) who had made contact with the defendant prior to that and arranged to purchase 4 ounces of cocaine that day. Agent Doyle searched the Cl and determined that he had no cash or drugs on his person. The Cl was given a quantity of United States currency, the serial numbers previously having been recorded by Agent Doyle. The Cl also was outfitted with a hidden transmitter designed to secretly record and transmit conversations. [1] Agent Doyle drove the Cl to the vicinity of 119 Garden Street about 1:45 p.m. and observed him enter the home through the one common doorway. From his vantage point, Agent Doyle could not see where the Cl went once inside that doorway. However, the Cl told Agent Doyle that after he entered through the common doorway, he entered a door on the right hand side into the first floor apartment.
Number 119 Garden Street appeared to be a two-family house but had several A-shaped dormers that suggested a third floor. Agent Doyle assumed that this third floor space was for storage and not a separate apartment. On June 15, 2000, many persons were seen to be entering and exiting 119 Garden Street.
After the Cl returned from his initial entry into the home, the Cl had a further meeting with agent Doyle. The Cl stated that the suspect, Henry, told him the “coke” wasn’t ready yet and that he (Henry) would page him when it was ready. There was an agreement that the Cl would purchase the cocaine for the price of approximately $3,640 per ounce. Agent Doyle arranged with the Cl that when he went back to purchase the drugs, the Cl would give a pre-arranged hand signal when leaving to indicate that he had purchased cocaine as planned.
After entering into the home a second time, and remaining inside for about one hour, the Cl exited again from the front door and gave the prearranged signal.
At this point, Special Agent Michael O’Shaunessey of the DEA, who was working on the case with Agent Doyle and who was positioned outside 119 Garden Street performing surveillance activities, received a transmission from Special Agent Doyle indicating that the transaction had occurred and that the crack cocaine had been delivered by another male who had come from upstairs and who had been involved in earlier drug deals. Special Agent Doyle also relayed a description of this other male. Special Agent O’Shaunessey who had been involved in the earlier investigation when drugs were sold to the Cl at 119 Garden Street knew that an Oldsmobile Cutlass automobile had been parked on the street in front of 119 Garden Street bearing Massachusetts Registration “7027 FK.” He further knew that it was registered to the defendant Perez with an address of 119 Garden Street, 2nd floor. Also, the agent had the person later identified as defendant Perez driving the cutlass around town and believed that he matched the description supplied by Agent Doyle.
As a result, Special Agent O’Shaunessey entered 119 Garden Street, went into the first floor apartment, the only apartment on that floor, and then entered a *297 second floor apartment from a stairway inside the apartment on the first floor. The second floor apartment consisted of a living room, a dining room, a kitchen and a master bedroom. Rosaida Chazulle, the person who signed the consent form in evidence as exhibit one, had been observed by Special Agent O’Shaunessey to exit 119 Garden Street carrying a baby in her arms shortly after 2:00 p.m. and then was observed to reenter the address about 2:30 p.m.
The Cl left the premises at approximately 3:20 p.m. After leaving 119 Garden street and giving the signal, the Cl met with Agent Doyle at a nearby location, gave him the cocaine he had purchased and told him that the guy with the cocaine for sale came down from the second floor while the Cl was inside the first floor apartment and that this individual then went back upstairs with the money. The Cl did not give the defendant’s name to Agent Doyle and did not actually see this other person actually enter-the second floor apartment. The Cl actually purchased 119 grams (slightly less than 4 ounces) for a reduced price of $2,600. The cash difference in the funds advanced to the Cl ($3,460) and the purchase price ($2,600) was returned by the Cl to Agent Doyle.
The Cl recognized this individual who had come from the second floor as the same person who was involved in earlier drugs sales with the Cl in the same location on January 11 and 27, 2001. It turns out that the Cl had made purchases in the past at this location on four separate occasions and each time purchased a larger amount of drugs. Each time the Cl set up the deal by a telephone call. Agent Doyle recalled a description of that person supplied by the Cl from that earlier transaction. At that time, Agent Doyle saw an individual leave 119 Garden Street and drive away from the scene in a silver Oldsmobile. The car was put under surveillance. A check with the registry of motor vehicles indicated it was registered to the defendant, Perez, with an address of 119 Garden Street, apartment No. 2. Agent Doyle relayed this information to other officers.
Agent Doyle entered 119 Garden Street. He went through the first floor apartment to the second floor where he found 4-5 Hispanic males and females including the defendant. The defendant matched the description supplied by the Cl of the person who had come down from upstairs to participate in the first floor drug transaction that had taken place earlier that day.[2] Agent Doyle arrested the defendant. There he saw Special Agent O’Shaunessey and a number of other police officers who had conducted a security sweep of the apartment, standing around Ms. Chazulle. She told the police, in English, she was the wife of Defendant Perez. She was not informed of her right to refuse to consent to a search. She did sign a consent to search form.
Based on the description of the defendant supplied to Agent Doyle and relayed by him to Agent O’Shaunessey, the defendant also was identified by Special Agent O’Shaunessey as he sat on a sofa in the livmgroom of the second floor. When he stood up, a large amount of cash, including some of the currency that was used in the purchase made that day by the Cl, was found in the area where he was seated. The police also found envelopes bearing the defendant’s name and the address of 119 Garden Street in the bedroom of the second floor apartment. Names and numbers on the envelope appear to resemble a ledger that may have served to keep track of drug sales. See exhibit 2. The agents also located and seized a pager inside the 2nd floor bedroom. Other agents recovered bags of crack cocaine in other locations within the second floor.
The Cl was not brought back to the scene or to another location to identify the defendant.
DISCUSSION
1. Consent to search. The burden of proving consent rests with the Commonwealth. Commonwealth v. Aguiar, 370 Mass. 490, 496 (1976). In Massachusetts, the law requires the Commonwealth to establish by a preponderance of the evidence that the party reportedly giving consent did so “unfettered by coercion, express or implied,” and by “something more than mere acquiescence to a claim of lawful authority.” Commonwealth v. Walker, 370 Mass. 548, 555, cert. den., 429 U.S. 943 (1976). Although there is no duty to advise a person that they may refuse to give consent, see Commonwealth v. Blais, 428 Mass. 294, 300 n. 4 (1998), it is a factor that may be considered. Despite the evidence of a written consent, based on the totality of the evidence presented to me, the Commonwealth has not met its burden of proving consent.
2. Probable cause. Although there was no warrant involved in this case, what has been said about the requirement of probable cause in connection with a search warrant has application nonetheless. “Constitutional standards for the reasonableness of a search or seizure . . . require that there be a fair probability that contraband or evidence of a crime will be found in a particular place, or that the issuing magistrate have a substantial basis for concluding that any of the articles described in the warrant are probably in the place to be searched. This probability standard does not mean that it must appear more likely than not that the items are in a particular place to be searched. And, there is no requirement at all that the person to whom a search warrant is directed should himself even be suspected of crime, much less that there be probable cause to believe him guilty.” Matter of Grand Jury Investigation, 427 Mass. 221, 224-25 (1998) (citations omitted). See also Commonwealth v. Donahue, 430 Mass. 710 (2000). Probable cause is, however, more than a mere statement of belief; it must include the underlying circumstances that produce the belief. Commonwealth v. Von Utter, 355 Mass. 597, 599 (1969). Hearsay evidence may be relied upon and *298 usually does form part of the underlying circumstances. Id. at 600.
Here, the Commonwealth has established the reliability of a confidential informant based on evidence that the informant purchased drugs from 119 Garden Street several months earlier in nearly identical circumstances, and that the informant engaged in a controlled buy prior to the entry of the police into the premises on June 15th. Commonwealth v. Cruz, 430 Mass. 838 (2000) (six controlled buys of cocaine over a four-week period based on telephone calls from undercover officer to seller at his apartment followed by transactions inside buyer’s car accompanied by discussions about the purchase of additional amounts of cocaine in the future were sufficient to establish probable cause to believe that seller had quantities of cocaine available in his apartment for sale at time warrant was sought); Commonwealth v. Villella, 39 Mass.App.Ct. 426 (1995) (a controlled buy supervised by the police provides probable cause to issue a search warrant even in circumstances in which the buy is made by an intermediary who while under police surveillance during the buy was not subject to a search before or after the buy). The informant’s statement that the defendant came down to the first floor apartment with the drugs from the second floor is certainly sufficient to establish probable cause to believe that drugs would be found in the second floor apartment.
3. Failure to obtain a search warrant. Subject only to a relatively few recognized exceptions, a warrantless entry of a home to conduct a search, even though based on probable cause to believe that drugs or other contraband will be found there, is unreasonable under both the Fourth Amendment to the United States Constitution and under Article 14 of the Declaration of Rights. Commonwealth v. Forde, 367 Mass. 798, 800 (1975). Accord, Kylo v. United States, 533 U.S. _ (June 11, 2001) (Scalia, J.) (“With few exceptions, the question whether a warrantless search of a home is reasonable and hence constitutional must be answered no”). One of these exceptions is when the police are confronted with exigent circumstances that make the requirement of a warrant impractical. The burden of establishing exigent circumstances rests with the Commonwealth. Commonwealth v. Young, 382 Mass. 448, 456-57, 458 (1981). The Appeals Court has described the conditions that may give rise to a genuine exigency as follows:
(1) the crime in question was one of violence and the suspect had been reported to be armed and dangerous; (2) probable cause to believe the suspect has committed a felony and strong reason to believe the suspect is in the particular dwelling; (3) the entry has been made peaceably (preferably in the daytime); (4) a likelihood that the delay attendant upon securing a warrant would facilitate the destruction of evidence or property; (5) a likelihood that the suspect would escape if not promptly apprehended; and (6) some showing of a reasonable basis for believing that delay would subject the officers or others to physical harm.
Commonwealth v. DiSanto, 8 Mass.App.Ct. 694, 700 (1979), cert. den., 449 U.S. 855 (1980). In other words, the “test is whether there is such a compelling necessity for immediate action as will not brook the delay of obtaining a warrant.” Commonwealth v. Kiser, 48 Mass. 647, 652 (2000).
When a police investigation of illegal drug activity has been underway for some period of time, it is often the case that the evidence points to a particular pattern of conduct that the target or targets have engaged in that afford the police ample opportunity to anticipate the exact location where a drug transaction will take place or where illegal drugs are kept and stored. In such a case, the police are not permitted to proceed without a warrant. See Commonwealth v. Wigfall, 32 Mass.App.Ct. 582 (1992). In other situations, the investigation involves a more dynamic situation in which the police are uncertain about where the drugs are located, who will be making a delivery or where the transaction will take place, or are kept waiting by the target until the very last moment before the location or nature of the transaction is revealed. In such a case, the uncertainty creates exigent circumstances which permit the police to proceed without a search warrant. See, e.g., Commonwealth v. DiToro, 51 Mass.App.Ct. 191, 195-97 (2001); Commonwealth v. Martinez, 47 Mass.App.Ct. 839, 842-43 (1999); Commonwealth v. Rotolo, 45 Mass.App.Ct. 927, rev. den., 428 Mass. 1110 (1998); Commonwealth v. Curdo, 26 Mass.App.Ct. 738, 746, rev. den., 404 Mass. 1102 (1989).
The facts in the present case involve ongoing criminal activity over a period of months at the same location, and suggest that the police planned the transaction which gave rise to probable cause to suit their own needs. The police had every reason to believe that when they made the arrangements with the Cl to purchase drugs at 119 Garden Street on June 15th, that the procedure would follow the pattern of previous encounters in which the drugs were delivered by the defendant from the upstairs apartment. Here, the police already knew the identity of the defendant from their surveillance and his involvement in prior transactions. They had the location under surveillance for several hours before the transaction took place. When the Cl made the initial entry into the first floor apartment, there was no indication that this pattern of prior behavior would change. Indeed, at the hearing in this case, Special Agent Doyle conceded that he could have obtained a search warrant back in January after the Cl made several controlled buys. Nothing about the investigation suggests that there was any less of an opportunity to obtain a search warrant on June 15th.
*299 Based on these facts, the Commonwealth has failed to sustain its burden of establishing the existence of exigent circumstances.
CONCLUSION
For the above reasons, the motion to suppress evidence seized without a warrant from the second floor apartment of 119 Garden Street in Lawrence is hereby ALLOWED.

 During the hearing on the defendant's pretrial motion to suppress, the Commonwealth sought to introduce evidence based on the contents of wireless recordings made by the Cl and transmitted to Special Agent Doyle. The court ruled that this evidence was not admissible because the electronic surveillance had not been undertaken in compliance with Massachusetts law. See G.L.c. 272, §99. See also Commonwealth v. Blood, 400 Mass. 61, 71 (1987). There is no claim that the wireless interception and secret recording of conversations in this case tainted other evidence seized by the Commonwealth.

 There was no evidence of what description was given by the Cl of this person who had come down from the second floor. For example, we do not know what physical characteristics of this person were described by the Cl. While I credit the testimony by Special Agent Doyle that the person he arrested in the second floor department, i.e., the defendant, appeared to fit the description supplied by the Cl, the evidential value of such testimony is not great in the absence of a more detailed explanation of the description given by Cl.